## SAMUEL A. WORCESTER, PLAINTIFF IN ERROR v. THE STATE OF GEORGIA.

A writ of error was issued to " the judges of the superior court for the county of Gwinnett in the state of Georgia," commanding them to send to the supreme court of the United States, the record and proceedings in the said superior court of the county of Gwinnett, between the state of Georgia, plaintiff, and Samuel A. Worcester, defendant, on an indictment in that court. The record of the court of Gwinnett was returned, certified by the clerk of the court, and was also authenticated by the seal of the court. It was returned with, and annexed to, a writ of error issued in regular form, the citation being signed by one of the associate justices of the supreme court, and served on the governor and attorney-general of the state more than thirty days before the commencement of the term to which the writ of error was returnable.

By the court: The judicial act, so far as it prescribes the mode of proceeding, appears to have been literally pursued. In February 1797, a rule was made on this subject, in the following words: " it is ordered by the court, that the clerk of the court to which any writ of error shall be directed, may make return of the same by transmitting a true copy of the record, and of all proceedings in the same, under his hand and the seal of the court."

This has been done. But the signature of the judge has not been added to that of the clerk. The law does not require it. The rule does not require it.

The plaintiff in error was indicted in the supreme court for the county of Gwinnett in the state of Georgia, " for residing, on the 15th July 1831, in that part of the Cherokee nation attached by the laws of the state of Georgia to that county, without a license or permit from the governor of the state, or from any one authorised to grant it, and without having taken the oath to support and defend the constitution and laws of the state of Georgia, and uprightly to demean himself as a citizen thereof, contrary to the laws of the said state." To this indictment he pleaded that he was, on the 15th July 1831, in the Cherokee nation, out of the jurisdiction of the court of Gwinnett county; that he was a citizen of Vermont, and entered the Cherokee nation as a missionary under the authority of the president of the United States, and has not been required by him to leave it, and that with the permission and approval of the Cherokee nation he was engaged in preaching the gospel: that the state of Georgia ought not to maintain the prosecution, as several treaties had been entered into by the United States with the Cherokee nation, by which that nation was acknowledged to be a sovereign nation, and by which the territory occupied by them was guarantied to them by the United States; and that the laws of Georgia, under which the plaintiff in error was indicted, are repugnant to the treaties, and unconstitutional and void, and also that they are repugnant to the act of congress of March 1802, entitled " an act to regulate trade and intercourse with the Indian tribes. The superior court of Gwinnett overruled the plea, and the plaintiff in error was tried and convicted, and sentenced " to hard labour in the penitentiary for four years." Held, that this was a case in which the supreme court of the United States had jurisdiction by writ of error, under

[Worcester v. The State of Georgia.]

the twenty-fifth section of the " act to establish the judicial courts of the United States" passed in 1789.

The indictment and plea in this case draw in question the validity of the treaties made by the United States with the Cherokee Indians: if not so, their construction is certainly drawn in question; and the decision has been, if not against their validity, " against the right, privilege or exemption specially set up and claimed under them." They also draw into question the validity of a statute of the state of Georgia, " on the ground of its being repugnant to the constitution, treaties and laws of the United States, and the decision is in favour of its validity."

It is too clear for controversy, that the act of congress, by which this court is constituted, has given it the power, and of course imposed on it the duty of exercising jurisdiction in this case. The record, according to the judiciary act and the rule and practice of the court, is regularly before the court.

The act of the legislature of Georgia, passed 22d December 1830, entitled " an act to prevent the exercise of assumed and arbitrary power by all persons, under pretext of authority from the Cherokee Indians," &c. enacts that " all white persons, residing within the limits of the Cherokee nation on the 1st day of March next, or at any time thereafter, without a license or permit from his excellency the governor, or from such agent as his excellency the governor shall authorise to grant such permit or license, and who shall not have taken the oath hereinafter required, shall be guilty of a high misdemeanour, and upon conviction thereof, shall be punished by confinement to the penitentiary at hard labour, for a term not less than four years." The eleventh section authorises the governor, " should he deem it necessary for the protection of the mines, or the enforcement of the laws in force within the Cherokee nation, to raise and organise a guard," &c. The thirteenth section enacts, " that the said guard or any member of them, shall be, and they are hereby authorised and empowered to arrest any person legally charged with or detected in a violation of the laws of this state, and to convey, as soon as practicable, the person so arrested, before a justice of the peace, judge of the superior, justice of interior court of this state, to be dealt with according to law." The extraterritorial power of every legislature being limited in its action to its own citizens or subjects, the very passage of this act is an assertion of jurisdiction over the Cherokee nation, and of the rights and powers consequent thereto.

The principle, " that discovery of parts of the continent of America gave title to the government by whose subjects, or by whose authority it was made, against all other European governments, which title might be consummated by possession," acknowledged by all Europeans, because it was the interest of all to acknowledge it; gave to the nation making the discovery, as its inevitable consequence, the sole right of acquiring the soil and of making settlements on it. It was an exclusive principle; which shut out the right of competition among those who had agreed to it; not one which could annul the previous rights of those who had not agreed to it. It regulated the right given by discovery among the European discoverers, but could not affect the rights of those already in possession, either as aboriginal occupants, or as occupants by virtue of a discovery made before the memory of man. It gave the exclusive right to purchase, but did not found that right on a denial of the right of the possessor to sell.

The relation between the Europeans and the natives was determined in each case by the particular government which asserted and could maintain this pre-

[Worcester v. The State of Georgia.]

emptive privilege in the particular place. The United States succeeded to all the claims of Great Britain, both territorial and political, but no attempt, so far as is known, has been made to enlarge them. So far as they existed merely in theory, or were in their nature only exclusive of the claims of other European nations, they still retain their original character, and remain dormant. So far as they have been practically exerted, they exist in fact, are understood by both parties, are asserted by the one, and admitted by the other.

Soon after Great Britain determined on planting colonies in America, the king granted charters to companies of his subjects, who associated for the purpose of carrying the views of the crown into effect, and of enriching themselves. The first of these charters was made before possession was taken of any part of the country. They purport generally to convey the soil, from the Atlantic to the South Sea. This soil was occupied by numerous and warlike nations, equally willing and able to defend their possessions. The extravagant and absurd idea, that the feeble settlements made on the sea coast, or the companies under whom they were made, acquired legitimate power by them to govern the people, or occupy the lands from sea to sea, did not enter the mind of any man. They were well understood to convey the title which, according to the common law of European sovereigns respecting America, they might rightfully convey, and no more. This was the exclusive right of purchasing such lands as the natives were willing to sell. The crown could not be understood to grant what the crown did not affect to claim, nor was it so understood.

Certain it is, that our history furnishes no example, from the first settlement of our country, of any attempt, on the part of the crown, to interfere with the internal affairs of the Indians, farther than to keep out the agents of foreign powers, who, as traders or otherwise, might seduce them into foreign alliances. The king purchased their lands when they were willing to sell, at a price they were willing to take; but never coerced a surrender of them. He also purchased their alliance and dependence by subsidies; but never intruded into the interior of their affairs, or interfered with their self government, so far as respected themselves only.

The third article of the treaty of Hopewell acknowledges the Cherokees to be under the protection of the United States of America, and of no other power.

This stipulation is found in Indian treaties, generally. It was introduced into their treaties with Great Britain; and may probably be found in those with other European powers. Its origin may be traced to the nature of their connexion with those powers; and its true meaning is discerned in their relative situation.

The general law of European sovereigns, respecting their claims in America, limited the intercourse of Indians, in a great degree, to the particular potentate, whose ultimate right of domain was acknowledged by the others. This was the general state of things in time of peace. It was sometimes changed in war. The consequence was, that their supplies were derived chiefly from that nation, and their trade confined to it. Goods, indispensable to their comfort, in the shape of presents, were received from the same hand. What was of still more importance, the strong hand of government was interposed to restrain the disorderly and licentious from intrusions into their country, from encroachments on their lands, and from those acts of violence which were often attended by reciprocal murder. The Indians perceived in this protection, only what was beneficial to themselves—an engagement to punish aggressions on them. It involved practically no claim to their lands, no dominion over their persons.

[Worcester v. The State of Georgia.]

It merely bound the nation to the British crown, as a dependent ally, claiming the protection of a powerful friend and neighbour, and receiving the advantages of that protection, without involving a surrender of their national character.

This is the true meaning of the stipulation, and is undoubtedly the sense in which it was made. Neither the British government, nor the Cherokees, ever understood it otherwise.

The same stipulation entered into with the United States, is undoubtedly to be construed in the same manner. They receive the Cherokee nation into their favour and protection. The Cherokees acknowledge themselves to be under the protection of the United States, and of no other power. Protection does not imply the destruction of the protected. The manner in which this stipulation was understood by the American government, is explained by the language and acts of our first president.

So with respect to the words "hunting grounds." Hunting was at that time the principal occupation of the Indians, and their land was more used for that purpose than for any other. It could not, however, be supposed, that any intention existed of restricting the full use of the lands they reserved.

To the United States, it could be a matter of no concern, whether their whole territory was devoted to hunting grounds, or whether an occasional village, and an occasional corn field interrupted, and gave some variety to the scene.

These terms had been used in their treaties with Great Britain, and had never been misunderstood. They had never been supposed to imply a right in the British government to take their lands, or to interfere with their internal government.

The sixth and seventh articles stipulate for the punishment of the citizens of either country, who may commit offences on or against the citizens of the other. The only inference to be drawn from them is, that the United States considered the Cherokees as a nation.

The ninth article is in these words: "for the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens or Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and *managing all their affairs*, as they think proper." To construe the expression "managing all their affairs," into a surrender of self government would be a perversion of their necessary meaning, and a departure from the construction which has been uniformly put on them. The great subject of the article is the Indian trade. The influence it gave made it desirable that congress should possess it. The commissioners brought forward the claim, with the profession that their motive was, "the benefit and comfort of the Indians, and the prevention of injuries or oppressions." This may be true, as respects the regulation of their trade, and as respects the regulation of all affairs connected with their trade; but cannot be true, as respects the management of all their affairs. The most important of these, is the cession of their lands, and security against intruders on them. Is it credible, that they could have considered themselves as surrendering to the United States, the right to dictate their future cessions, and the terms on which they should be made; or to compel their submission to the violence of disorderly and licentious intruders? It is equally inconceivable that they could have supposed themselves, by a phrase thus slipped into an article, on another and more interesting subject, to have divested themselves of the right of self government on subjects not connected with trade. Such a measure could not be

[Worcester v. The State of Georgia.]

" for their benefit and comfort," or for " the prevention of injuries and oppress-ion." Such a construction would be inconsistent with the spirit of this and of all subsequent treaties; especially of those articles which recognise the right of the Cherokees to declare hostilities, and to make war. It would convert á treaty of peace covertly into an act annihilating the political existence of one of the parties. Had such a result been intended, it would have been openly avowed.

This treaty contains a few terms capable of being used in a sense which could not have been intended at the time, and which is inconsistent with the practi-cal construction which has always been put on them; but its essential articles treat the Cherokees as a nation capable of maintaining the relations of peace and war; and ascertain the boundaries between them and the United States.

The treaty of Holston, negotiated with the Cherokees in July 1791; explicitly recognising the national character of the Cherokees, and their right of self-government; thus guarantying their lands; assuming the duty of protection; and of course pledging the faith of the United States for that protection; has been frequently renewed, and is now in full force.

To the general pledge of protection have been added several specific pledges, deemed valuable by the Indians. Some of these restrain the citizens of the United States from encroachments on the Cherokee country, and provide for the punishment of intruders.

The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union.

The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possess-ors of the soil, from time immemorial; with the single exception of that im-posed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particu-lar region claimed: and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term " nation," so generally applied to them, means " a people distinct from others." The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the pre-vious treaties with the Indian nations, and, consequently, admits their rank among those powers who are capable of making treaties. The words " treaty" and " nation" are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well under-stood meaning. We have applied them to Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense.

Georgia, herself, has furnished conclusive evidence that her former opinions on this subject concurred with those entertained by her sister states, and by the government of the United States. Various acts of her legislature have been cited in the argument, including the contract of cession made in the year 1802, all tending to prove her acquiescence in the universal conviction that the In-dian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States with their consent: that their territory was separated from that of any state within whose chartered limits they might reside, by a boundary line, established by treaties: that, within their boundary, they possessed rights with which no state could interfere: and that the whole power of regulating the intercourse with them was vested in the United States.

In opposition to the original right, possessed by the undisputed occupants of every country, to this recognition of that right, which is evidenced by our history in every change through which we have passed, are placed the charters granted by the monarch of a distant and distinct region, parcelling out a territory in possession of others, whom he could not remove, and did not attempt to remove, and the cession made of his claims, by the treaty of peace. The actual state of things at the time, and all history since, explain these charters; and the king of Great Britain, at the treaty of peace, could cede only what belonged to his crown. These newly asserted titles can derive no aid from the articles so often repeated in Indian treaties, extending to them, first, the protection of Great Britain, and afterwards that of the United States. These articles are associated with others, recognising their title to self-government. The very fact of repeated treaties with them recognises it; and the settled doctrine of the law of nations is, that a weaker power does not surrender its independence—its right to self-government, by associating with a stronger, and taking its protection. A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state. Examples of this kind are not wanting in Europe. "Tributary and feudatory states," says Vattel, "do not thereby cease to be sovereign and independent states, so long as self-government and sovereign and independent authority are left in the administration of the state." At the present day, more than one state may be considered as holding its right of self-government under the guarantee and protection of one or more allies.

The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States.

The act of the state of Georgia, under which the plaintiff in error was prosecuted, is consequently void, and the judgment a nullity.

The acts of the legislature of Georgia interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, is committed exclusively to the government of the union.

They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; and recognise the pre-existing power of the nation to govern itself.

They are in equal hostility with the acts of congress for regulating this intercourse and giving effect to the treaties.

The forcible seizure and abduction of the plaintiff in error, who was residing in the nation, with its permission, and by authority of the president of the United States, is also a violation of the acts which authorise the chief magistrate to exercise this authority.

Will these powerful considerations avail the plaintiff in error? We think they will. He was seized and forcibly carried away, while under guardianship of treaties guarantying the country in which he resided and taking it under the protection of the United States. He was seized while performing, under the

sanction of the chief magistrate of the union, those duties which the humane policy adopted by congress had recommended. He was apprehended, tried, and condemned, under colour of a law which has been shown to be repugnant to the constitution, laws, and treaties of the United States. Had a judgment, liable to the same objections, been rendered for property, none would question the jurisdiction of this court. It cannot be less clear when the judgment affects personal liberty, and inflicts disgraceful punishment; if punishment could disgrace when inflicted on innocence. The plaintiff in error is not less interested in the operation of this unconstitutional law than if it affected his property. He is not less entitled to the protection of the constitution, laws, and treaties of his country.

THIS was a writ of error to the superior court for the county of Gwinnett, in the state of Georgia.

On the 22d December 1830, the legislature of the state of Georgia passed the following act:

" An act to prevent the exercise of assumed and arbitrary power, by all persons, under pretext of authority from the Cherokee Indians and their laws, and to prevent white persons from residing within that part of the chartered limits of Georgia, occupied by the Cherokee Indians, and to provide a guard for the protection of the gold mines, and to enforce the laws of the state within the aforesaid territory.

" Be it enacted by the senate and house of representatives of the state of Georgia in general assembly met, and it is hereby enacted by the authority of the same, that, after the 1st day of February 1831, it shall not be lawful for any person or persons, under colour or pretence of authority from said Cherokee tribe, or as headmen, chiefs or warriors of said tribe, to cause or procure by any means the assembling of any council or other pretended legislative body of the said Indians or others living among them, for the purpose of legislating (or for any other purpose whatever). And persons offending against the provisions of this section shall be guilty of a high misdemeanour, and subject to indictment therefor, and, on conviction, shall be punished by confinement at hard labour in the penitentiary for the space of four years.

" Sec. 2. And be it further enacted by the authority aforesaid, that, after the time aforesaid, it shall not be lawful for any person or persons, under pretext of authority from the Cherokee tribe, or as representatives, chiefs, headmen or warriors of said tribe, to meet or assemble as a council, assembly,

convention, or in any other capacity, for the purpose of making laws, orders or regulations for said tribe. And all persons offending against the provisions of this section, shall be guilty of a high misdemeanour, and subject to an indictment, and, on conviction thereof, shall undergo an imprisonment in the penitentiary at hard labour for the space of four years.

"Sec. 3. And be it further enacted by the authority aforesaid, that, after the time aforesaid, it shall not be lawful for any person or persons, under colour or by authority of the Cherokee tribe, or any of its laws or regulations, to hold any court or tribunal whatever, for the purpose of hearing and determining causes, either civil or criminal; or to give any judgment in such causes, or to issue, or cause to issue, any process against the person or property of any of said tribe. And all persons offending against the provisions of this section shall be guilty of a high misdemeanour, and subject to indictment, and, on conviction thereof, shall be imprisoned in the penitentiary at hard labour for the space of four years.

"Sec. 4. And be it further enacted by the authority aforesaid, that, after the time aforesaid, it shall not be lawful for any person or persons, as a ministerial officer, or in any other capacity, to execute any precept, command or process issued by any court or tribunal in the Cherokee tribe, on the persons or property of any of said tribe. And all persons offending against the provisions of this section, shall be guilty of a trespass, and subject to indictment, and, on conviction thereof, shall be punished by fine and imprisonment in the jail or in the penitentiary, not longer than four years; at the discretion of the court.

"Sec. 5. And be it further enacted by the authority aforesaid, that, after the time aforesaid, it shall not be lawful for any person or persons to confiscate, or attempt to confiscate, or otherwise to cause a forfeiture of the property or estate of any Indian of said tribe, in consequence of his enrolling himself and family for emigration, or offering to enrol for emigration, or any other act of said Indian, in furtherance of his intention to emigrate. And persons offending against the provisions of this section shall be guilty of high misdemeanour, and, on conviction, shall undergo an imprisonment in the penitentiary at hard labour for the space of four years.

" Sec. 6. And be it further enacted by the authority aforesaid, that none of the provisions of this act shall be so construed as to prevent said tribe, its headmen, chiefs or other representatives, from meeting any agent or commissioner, on the part of this state or the United States, for any purpose whatever.

" Sec. 7. And be it further enacted by the authority aforesaid, that all white persons residing within the limits of the Cherokee nation, on the 1st day of March next, or at a v time thereafter, without a license or permit from his excellency the governor, or from such agent as his excellency the governor shall authorise to grant such permit or license, and who shall not have taken the oath hereinafter required, shall be guilty of a high misdemeanour, and, upon conviction thereof, shall be punished by confinement to the penitentiary at hard labour for a term not less than four years: provided, that the provisions of this section shall not be so construed as to extend to any authorised agent or agents of the government of the United States or of this state, or to any person or persons who may rent any of those improvements which have been abandoned by Indians who have emigrated west of the Mississippi: provided, nothing contained in this section shall be so construed as to extend to white females, and all male children under twenty-one years of age.

" Sec. 8. And be it further enacted by the authority aforesaid, that all white persons, citizens of the state of Georgia, who have procured a license in writing from his excellency the governor, or from such agent as his excellency the governor shall authorise to grant such permit or license, to reside within the limits of the Cherokee nation, and who have taken the following oath, viz. "I, A. B., do solemnly swear (or affirm, as the case may be) that I will support and defend the constitution and laws of the state of Georgia, and uprightly demean myself as a citizen thereof, so help me God," shall be, and the same are hereby declared, exempt and free from the operation of the seventh section of this act.

" Sec. 9. And be it further enacted, that his excellency the governor be, and he is hereby, authorized to grant licenses to reside within the limits of the Cherokee nation. according to the provisions of the eighth section of this act.

" Sec. 10. And be it further enacted by the authority afore-

said, that no person shall collect or claim any toll from any person, for passing any turnpike gate or toll bridge, by authority of any act or law of the Cherokee tribe, or any chief or headman or men of the same.

"Sec. 11. And be it further enacted by the authority aforesaid, that his excellency the governor be, and he is hereby, empowered, should he deem it necessary, either for the protection of the mines, or for the enforcement of the laws of force within the Cherokee nation, to raise and organize a guard, to be employed on foot, or mounted, as occasion may require, which shall not consist of more than sixty persons, which guard shall be under the command of the commissioner or agent appointed by the governor, to protect the mines, with power to dismiss from the service any member of said guard, on paying the wages due for services rendered, for disorderly conduct, and make appointments to fill the vacancies occasioned by such dismissal.

"Sec. 12. And be it further enacted by the authority aforesaid, that each person who may belong to said guard, shall receive for his compensation at the rate of fifteen dollars per month when on foot, and at the rate of twenty dollars per month when mounted, for every month that such person is engaged in actual service; and, in the event, that the commissioner or agent, herein referred to, should die, resign, or fail to perform the duties herein required of him, his excellency the governor is hereby authorised and required to appoint, in his stead, some other fit and proper person to the command of said guard; and the commissioner or agent, having the command of the guard aforesaid, for the better discipline thereof, shall appoint three sergeants, who shall receive at the rate of twenty dollars per month while serving on foot, and twenty-five dollars per month, when mounted, as compensation whilst in actual service.

"Sec. 13. And be it further enacted by the authority aforesaid, that the said guard, or any member of them, shall be, and they are hereby, authorised and empowered to arrest any person legally charged with, or detected in, a violation of the laws of this state, and to convey, as soon as practicable, the person so arrested before a justice of the peace, judge of the superior or justice of inferior court of this state, to be dealt

with according to law; and the pay and support of said guard be provided out of the fund already appropriated for the protection of the gold mines."

The legislature of Georgia, on the 19th December 1829, passed the following act:

" An act to add the territory lying within the chartered limits of Georgia, and now in the occupancy of the Cherokee Indians, to the counties of Carroll, De Kalb, Gwinnett, Hall, and Habersham, and to extend the laws of this state over the same, and to annul all laws and ordinances made by the Cherokee nation of Indians, and to provide for the compensation of officers serving legal process in said territory, and to regulate the testimony of Indians, and to repeal the ninth section of the act of 1828 upon this subject.

" Sec. 1. Be it enacted by the senate and house of representatives of the state of Georgia in general assembly met, and it is hereby enacted by the authority of the same, that from and after the passing of this act, all that part of the unlocated territory within the limits of this state, and which lies between the Alabama line and the old path leading from the Buzzard Roost on the Chattahoochee, to Sally Hughes's, on the Hightower river; thence to Thomas Pelet's, on the old federal road; thence with said road to the Alabama line be, and the same is hereby added to, and shall become a part of, the county of Carroll.

" Sec. 2. And be it further enacted, that all that part of said territory lying and being north of the last mentioned line, and south of the road running from Charles Gait's ferry, on the Chattahoochee river, to Dick Roe's, to where it intersects with the path aforesaid, be, and the same is hereby added to, and shall become a part of, the county of De Kalb.

" Sec. 3. And be it further enacted, that all that part of the said territory lying north of the last mentioned line, and south of a line commencing at the mouth of Baldridge's creek; thence up said creek to its source; from thence to where the federal road crosses the Hightower; thence with said road to the Tennessee line, be, and the same is hereby added to, and shall become part of, the county of Gwinnett.

" Sec. 4. And be it further enacted, that all that part of the said territory lying north of said last mentioned line, and south

of a line to commence on the Chestatee river, at the mouth of Yoholo creek; thence up said creek to the top of the Blue ridge; thence to the head waters of Notley river; thence down said river to the boundary line of Georgia, be, and the same is hereby added to, and shall become a part of, the county of Hall.

" Sec. 5. And be it further enacted, that all that part of said territory lying north of said last mentioned line, within the limits of this state, be, and the same is hereby added to, and shall become a part of, the county of Habersham.

" Sec. 6. And be it further enacted, that all the laws, both civil and criminal, of this state, be, and the same are hereby extended over said portions of territory, respectively; and all persons whatever, residing within the same, shall, after the 1st day of June next, be subject and liable to the operation of said laws, in the same manner as other citizens of this state, or the citizens of said counties, respectively; and all writs and processes whatever, issued by the courts or officers of said courts, shall extend over, and operate on, the portions of territory hereby added to the same, respectively.

" Sec. 7. And be it further enacted, that after the 1st day of June next, all laws, ordinances, orders and regulations, of any kind whatever, made, passed or enacted, by the Cherokee Indians, either in general council or in any other way whatever, or by any authority whatever of said tribe, be, and the same are hereby declared to be, null and void, and of no effect, as if the same had never existed; and in all cases of indictment or civil suits, it shall not be lawful for the defendant to justify under any of said laws, ordinances, orders or regulations; nor shall the courts of this state permit the same to be given in evidence on the trial of any suit whatever.

" Sec. 8. And be it further enacted, that it shall not be lawful for any person or body of persons, by arbitrary power or by virtue of any pretended rule, ordinance, law or custom of said Cherokee nation, to prevent by threats, menaces or other means, or endeavour to prevent, any Indian of said nation, residing within the chartered limits of this state, from enrolling as an emigrant, or actually emigrating or removing from said nation; nor shall it be lawful for any person or body of persons, by arbitrary power or by virtue of any pretended rule,

ordinance, law or custom of said nation, to punish, in any manner, or to molest either the person or property, or to abridge the rights or privileges of any Indian, for enrolling his or her name as an emigrant, or for emigrating or intending to emigrate, from said nation.

"Sec. 9. And be it further enacted, that any person or body of persons offending against the provisions of the foregoing section, shall be guilty of a high misdemeanour, subject to indictment, and on conviction shall be punished by confinement in the common jail of any county of this state, or by confinement at hard labour in the penitentiary, for a term not exceeding four years, at the discretion of the court.

"Sec. 10. And be it further enacted, that it shall not be lawful for any person or body of persons, by arbitrary power, or under colour of any pretended rule, ordinance, law or custom of said nation, to prevent or offer to prevent, or deter any Indian headman, chief or warrior of said nation, residing within the chartered limits of this state, from selling or ceding to the United States, for the use of Georgia, the whole or any part of said territory, or to prevent or offer to prevent, any Indian, headman, chief or warrior of said nation, residing as aforesaid, from meeting in council or treaty any commissioner or commissioners on the part of the United States, for any purpose whatever.

"Sec. 11. And be it further enacted, that any person or body of persons offending against the provisions of the foregoing sections, shall be guilty of a high misdemeanour, subject to indictment, and on conviction shall be confined at hard labour in the penitentiary for not less than four nor longer than six years, at the discretion of the court.

"Sec. 12. And be it further enacted, that it shall not be lawful for any person or body of persons, by arbitrary force, or under colour of any pretended rules, ordinances, law or custom of said nation, to take the life of any Indian residing as aforesaid, for enlisting as an emigrant; attempting to emigrate; ceding, or attempting to cede, as aforesaid, the whole or any part of the said territory; or meeting or attempting to meet, in treaty or in council, as aforesaid, any commissioner or commissioners aforesaid; and any person or body of persons offending against the provisions of this section, shall be guilty of

murder, subject to indictment, and, on conviction, shall suffer death by hanging.

" Sec. 13. And be it further enacted, that, should any of the foregoing offences be committed under colour of any pretended rules, ordinances, custom or law of said nation, all persons acting therein, either as individuals or as pretended executive, ministerial or judicial officers, shall be deemed and considered as principals, and subject to the pains and penalties hereinbefore described.

" Sec. 14. And be it further enacted, that for all demands which may come within the jurisdiction of a magistrate's court, suit may be brought for the same in the nearest district of the county to which the territory is hereby annexed; and all officers serving any legal process on any person living on any portion of the territory herein named, shall be entitled to recover the sum of five cents for every mile he may ride to serve the same, after crossing the present limits of the said counties, in addition to the fees already allowed by law; and in case any of the said officers should be resisted in the execution of any legal process issued by any court or magistrate, justice of the inferior court, or judge of the superior court of any of said counties, he is hereby authorised to call out a sufficient number of the militia of said counties to aid and protect him in the execution of this duty.

" Sec. 15. And be it further enacted, that no Indian or descendant of any Indian, residing within the Creek or Cherokee nations of Indians, shall be deemed a competent witness in any court of this state to which a white person may be a party, except such white person resides within the said nation."

In September 1831, the grand jurors for the county of Gwinnett in the state of Georgia, presented to the superior court of the county the following indictment:

" Georgia, Gwinnett county:—The grand jurors, sworn, chosen and selected for the county of Gwinnett, in the name and behalf of the citizens of Georgia, charge and accuse Elizur Butler, Samuel A. Worcester, James Trott, Samuel Mays, Surry Eaton, Austin Copeland, and Edward D. Losure, white persons of said county, with the offence of 'residing within the limits of the Cherokee nation without a license:' For that the said Elizur Butler, Samuel A. Wor-

cester, James Trott, Samuel Mays, Surry Eaton, Austin Cope-
land and Edward D. Losure, white persons, as aforesaid, on
the 15th day of July 1831, *did reside* in that part of the Chero-
kee nation attached by the laws of said state to the said county,
and in the county aforesaid, without a license or permit from
his excellency the governor of said state, or from any agent
authorised by his excellency the governor aforesaid to grant
such permit or license, and without having taken the oath to
support and defend the constitution and laws of the state of
Georgia, and uprightly to demean themselves as citizens there-
of, contrary to the laws of said state, the good order, peace and
dignity thereof."

To this indictment, the plaintiff in error pleaded specially,
as follows:

" And the said Samuel A. Worcester, in his own proper per-
son, comes and says, that this court ought not to take further
cognizance of the action and prosecution aforesaid, because, he
says, that, on the 15th day of July in the year 1831, he was,
and still is, a resident in the Cherokee nation; and that the
said supposed crime, or crimes, and each of them, were com-
mitted, if committed at all, at the town of New Echota, in the
said Cherokee nation, out of the jurisdiction of this court, and
not in the county Gwinnett, or elsewhere within the jurisdic-
tion of this court. And this defendant saith, that he is a citi-
zen of the state of Vermont, one of the United States of Ame-
rica, and that he entered the aforesaid Cherokee nation in the
capacity of a duly authorised missionary of the American
Board of Commissioners for Foreign Missions, under the au-
thority of the president of the United States, and has not since
been required by him to leave it: that he was, at the time of
his arrest, engaged in preaching the gospel to the Cherokee
Indians, and in translating the sacred Scriptures into their lan-
guage, with the permission and approval of the said Cherokee
nation, and in accordance with the humane policy of the
government of the United States, for the civilization and im-
provement of the Indians; and that his residence there, for this
purpose, is the residence charged in the aforesaid indictment:
and this defendant further saith, that this prosecution the state
of Georgia ought not to have or maintain, because, he saith,
that several treaties have, from time to time, been entered

into between the United States and the Cherokee nation of Indians, to wit: at Hopewell, on the 28th day of November 1785; at Holston, on the 2d day of July 1791; at Philadelphia, on the 26th day of June 1794; at Tellico, on the 2d day of October 1798; at Tellico, on the 24th day of October 1804; at Tellico, on the 25th day of October 1805; at Tellico, on the 27th day of October 1805; at Washington city, on the 7th day of January 1805; at Washington city, on the 22d day of March 1816; at the Chickasaw Council House, on the 14th day of September 1816; at the Cherokee Agency, on the 8th day of July 1817, and at Washington city, on the 27th day of February 1819: all which treaties have been duly ratified by the senate of the United States of America; and, by which treaties the United States of America acknowledge the said Cherokee nation to be a sovereign nation, authorised to govern themselves, and all persons who have settled within their territory, free from any right of legislative interference by the several states composing the United States of America, in reference to acts done within their own territory; and, by which treaties, the whole of the territory now occupied by the Cherokee nation, on the east of the Mississippi, has been solemnly guarantied to them; all of which treaties are existing treaties at this day, and in full force. By these treaties, and particularly by the treaties of Hopewell and Holston, the aforesaid territory is acknowledged to lie without the jurisdiction of the several states composing the union of the United States; and, it is thereby specially stipulated, that the citizens of the United States shall not enter the aforesaid territory, even on a visit, without a passport from the governor of a state, or from some one duly authorised thereto by the president of the United States: all of which will more fully and at large appear, by reference to the aforesaid treaties. And this defendant saith, that the several acts charged in the bill of indictment, were done, or omitted to be done, if at all, within the said territory so recognized as belonging to the said nation, and so, as aforesaid, held by them, under the guarantee of the United States: that, for those acts, the defendant is not amenable to the laws of Georgia, nor to the jurisdiction of the courts of the said state; and that the laws of the state of Georgia, which profess to add the said territory to the several adjacent counties of the said state, and to extend the laws of Georgia over the said ter-

[Worcester v. The State of Georgia.]

ritory, and persons inhabiting the same; and, in particular, the act on which this indictment against this defendant is grounded, to wit: 'an act entitled an act to prevent the exercise of assumed and arbitrary power, by all persons, under pretext of authority from the Cherokee Indians, and their laws, and to prevent white persons from residing within that part of the chartered limits of Georgia, occupied by the Cherokee Indians, and to provide a guard for the protection of the gold mines, and to enforce the laws of the state within the aforesaid territory,' are repugnant to the aforesaid treaties; which, according to the constitution of the United States, compose a part of the supreme law of the land; and that these laws of Georgia are, therefore, unconstitutional, void, and of no effect: that the said laws of Georgia are also unconstitutional and void, because they impair the obligation of the various contracts formed by and between the aforesaid Cherokee nation and the said United States of America, as above recited: also, that the said laws of Georgia are unconstitutional and void, because they interfere with, and attempt to regulate and control the intercourse with the said Cherokee nation, which, by the said constitution, belongs exclusively to the congress of the United States; and because the said laws are repugnant to the statute of the United States, passed on the —— day of March 1802, entitled 'an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers:' and that, therefore, this court has no jurisdiction to cause this defendant to make further or other answer to the said bill of indictment, or further to try and punish this defendant for the said supposed offence or offences alleged in the bill of indictment, or any of them: and, therefore, this defendant prays judgment whether he shall be held bound to answer further to said indictment."

This plea was overruled by the court; and the jurisdiction of the superior court of the county of Gwinnett was sustained by the judgment of the court.

The defendant was then arraigned, and pleaded " not guilty:" and the case came on for trial on the 15th of September 1831, when the jury found the defendants in the indictment guilty. On the same day the court pronounced sentence on the parties so convicted, as follows:

"The State v. B. F. Thompson and others. Indictment for residing in the Cherokee nation without license. Verdict, Guilty."

"The State v. Elizur Butler, Samuel A. Worcester and others. Indictment for residing in the Cherokee nation without license. Verdict, Guilty."

"The defendants, in both of the above cases, shall be kept in close custody by the sheriff of this county, until they can be transported to the penitentiary of this state, and the keeper thereof is hereby directed to receive them, and each of them, into his custody, and keep them, and each of them, at hard labour in said penitentiary, for and during the term of four years."

A writ of error was issued on the application of the plaintiff in error, on the 27th of October 1831, which, with the following proceedings thereon, was returned to this court.

"United States of America, ss.—The president of the United States to the honourable the judges of the superior court for the county of Gwinnett, in the state of Georgia, greeting:

"Because in the record and proceedings, as also in the rendition of the judgment of a plea which is in the said superior court, for the county of Gwinnett, before you, or some of you, between the state of Georgia, plaintiff, and Samuel A. Worcester, defendant, on an indictment, being the highest court of law in said state in which a decision could be had in said suit, a manifest error hath happened, to the great damage of the said Samuel A. Worcester, as by his complaint appears. We being willing that error, if any hath been, should be duly corrected, and full and speedy justice done to the parties aforesaid in this behalf, do command you, if judgment be therein given, that then under your seal distinctly and openly, you send the record and proceedings aforesaid, with all things concerning the same, to the supreme court of the United States, together with this writ, so that you have the same at Washington on the second Monday of January next, in the said supreme court, to be then and there held; that the record and proceedings aforesaid being inspected, the said supreme court may cause further to be done therein, to correct that error, what of right, and according to the laws and custom of the United States, should be done.

[Worcester v. The State of Georgia.]

" Witness, the honourable John Marshall, chief justice of the said supreme court, the first Monday of August in the year of our Lord one thousand eight hundred and thirty-one.

WM. THOS. CARROLL,

Clerk of the Supreme Court of the United States.

" Allowed by HENRY BALDWIN.

" United States of America to the state of Georgia, greeting:

" You are hereby cited and admonished to be, and appear at a supreme court of the United States, to be holden at Washington, on the second Monday of January next, pursuant to a writ of error filed in the clerk's office of the superior court for the county of Gwinnett, in the state of Georgia, wherein Samuel A. Worcester is plaintiff in error, and the state of Georgia is defendant in error, to show cause, if any there be, why judgment rendered against the said Samuel A. Worcester, as in the said writ of error mentioned, should not be corrected, and why speedy justice should not be done to the parties in that behalf.

"Witness, the honourable Henry Baldwin, one of the justices of the supreme court of the United States, this 27th day of October, in the year of our Lord one thousand eight hundred and thirty-one.                    HENRY BALDWIN.

" State of Georgia, county of Gwinnett, sct.—On this 26th day of November, in the year of our Lord eighteen hundred and thirty-one, William Potter personally appeared before the subscriber, John Mills, a justice of the peace in and for said county, and being duly sworn on the holy evangelists of Almighty God, deposeth and saith, that on the 24th day of November instant, he delivered a true copy of the within citation to his excellency, Wilson Lumpkin, governor of the state of Georgia, and another true copy thereof he delivered, on the 22d day of November, instant, to Charles J. Jenkins, Esq. attorney-general of the state aforesaid, showing to the said governor and attorney-general, respectively, at the times of delivery herein stated, the within citation.   WM. POTTER.

" Sworn to and subscribed before me, the day and year above written.   JOHN MILLS, J. P."

This writ of error was returned to the supreme court with

copies of all the proceedings in the supreme court of the county of Gwinnett, as stated, and accompanied with certificates of the clerk of that court in the following terms:

"Georgia, Gwinnett county. I, John G. Park, clerk of the superior court of the county of Gwinnett, and state aforesaid, do certify that the annexed and foregoing is a full and complete exemplification of the proceedings and judgments had in said court against Samuel A. Worcester, one of the defendants in the case therein mentioned, as they remain, of record, in the said superior court.

"Given under my hand, and seal of the court, this 28th day of November 1831.          JOHN G. PARK, Clerk.

" I also certify, that the original bond, of which a copy is annexed (the bond was in the usual form), and also a copy of the annexed writ of error, were duly deposited and filed in the clerk's office of said court, on the 10th day of November in the year of our Lord eighteen hundred and thirty-one.

"Given under my hand and seal aforesaid, the day and date above written.          JOHN G. PARK, Clerk."

The case of Elizur Butler, plaintiff in error v. The State of Georgia, was brought before the supreme court in the same manner.

The case was argued for the plaintiffs in error by Mr Sergeant and Mr Wirt, with whom also was Mr Elisha W. Chester.

The following positions were laid down and supported by Mr Sergeant and Mr Wirt.

1. That the court had jurisdiction of the question brought before them by the writ of error; and the jurisdiction extended equally to criminal and to civil cases.

2. That the writ of error was duly issued, and duly returned, so as to bring the question regularly before the court, under the constitution and laws of the United States; and oblige the court to take cognizance of it.

3. That the statute of Georgia under which the plaintiffs in error were indicted and convicted, was unconstitutional and void. Because:

[Worcester v. The State of Georgia.]

1. By the constitution of the United States, the establishment and regulation of intercourse with the Indians belonged, exclusively, to the government of the United States.

2. The power thus given, exclusively, to the government of the United States had been exercised by treaties and by acts of congress, now in force, and applying directly to the case of the Cherokees; and that no state could interfere, without a manifest violation of such treaties and laws, which by the constitution were the supreme law of the land.

3. The statute of Georgia assumed the power to change these regulations and laws; to prohibit that which they permitted; and to make that criminal which they declared innocent or meritorious; and to subject to condemnation and punishment, free citizens of the United States who had committed no offence.

4. That the indictment, conviction, and sentence being founded upon a statute of Georgia, which was unconstitutional and void; were themselves also void and of no effect, and ought to be reversed.

These several positions were supported, enforced and illustrated by argument and authority.

The following authorities were referred to:

2 Laws U. S. 65, sect. 25; Judiciary Act of 1789; Miller v. Nicols, 4 Wheat. 311; Craig v. State of Missouri, 4 Peters, 400, 429; Fisher v. Cockerell, 5 Peters, 248; Ex parte Kearny, 7 Wheat. 38; Cohens v. Virginia, 6 Wheat. 264; Martin v. Hunter, 1 Wheat. 304, 315, 361; 1 Laws U. S. 488, 470, 472, 482, 484, 486, 453; Blunt's Historical Sketch, 106, 107; Treaties with the Cherokees, 28th Nov. 1785, 2d July 1791, 26th July 1794, 2d Oct. 1798; 3 Laws U. S. 27, 125, 284, 303, 344, 460; 12 Journ. Congress, 82; Blunt's Hist. Sketch, 113, 110, 111, 114; Federalist, No. 42; 1 Laws U. S. 454; Holland v. Pack, Peck's Rep. 151; Johnson v. M'Intosh, 8 Wheat. 543; Cherokee Nation v. State of Georgia, 5 Peters, 1, 16, 27, 31, 48; Ware v. Hylton, 3 Dall. 199; Hughes v. Edwards, 9 Wheat. 489; Fisher v. Hamden, 1 Paine, 55; Hamilton v. Eaton, North Carolina Cases, 79; M'Cullough v. State of Maryland, 4 Wheat. 316; 2 Laws U. S. 121; 3 Laws U. S. 460; 6 Laws U. S. 750; Gibbon v. Ogden, 9 Wheat. 1.

[Worcester v. The State of Georgia.]

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This cause, in every point of view in which it can be placed, is of the deepest interest.

The defendant is a state, a member of the union, which has exercised the powers of government over a people who deny its jurisdiction, and are under the protection of the United States.

The plaintiff is a citizen of the state of Vermont, condemned to hard labour for four years in the penitentiary of Georgia; under colour of an act which he alleges to be repugnant to the constitution, laws, and treaties of the United States.

The legislative power of a state, the controlling power of the constitution and laws of the United States, the rights, if they have any, the political existence of a once numerous and powerful people, the personal liberty of a citizen, are all involved in the subject now to be considered.

It behoves this court, in every case, more especially in this, to examine into its jurisdiction with scrutinizing eyes; before it proceeds to the exercise of a power which is controverted.

The first step in the performance of this duty is the inquiry whether the record is properly before the court.

It is certified by the clerk of the court, which pronounced the judgment of condemnation under which the plaintiff in error is imprisoned; and is also authenticated by the seal of the court. It is returned with, and annexed to, a writ of error issued in regular form, the citation being signed by one of the associate justices of the supreme court, and served on the governor and attorney-general of the state, more than thirty days before the commencement of the term to which the writ of error was returnable.

The judicial act (sec. 22, 25, 2 Laws U. S. 64, 65), so far as it prescribes the mode of proceeding, appears to have been literally pursued.

In February 1797, a rule (6 Wheat Rules) was made on this subject, in the following words: "It is ordered by the court, that the clerk of the court to which any writ of error shall be directed, may make return of the same by transmitting a true

copy of the record, and of all proceedings in the same, under· his hand and the seal of the court."

. This, has been done.   But the signature of the judge has not been added to that of the clerk.   . The law does not-require it. The rule does not require it.

In the case of Martin v. Hunter's Lessee, 1 Wheat. 304, 361, an exception was taken-to the return of the refusal of the state court to enter a prior judgment of reversal by this court; because it was .not made by the judge of the state court to which the writ was directed: but the exception was overruled, and.the return was held sufficient.   In Buel v. Van Ness, 8 Wheat. 312, also a writ of error to a state court, the record was authenticated in the same manner.   No exception was taken to it.   These were civil cases.   But it has been truly said at the bar, that, in regard to this process, the law makes no distinction between a criminal and civil case.   The same return is required in both.   If the sanction of the court could be necessary for the establishment of this position, it has been silently given.

M'Culloch v. The State of Maryland, 4 Wheat. 316, was a *qui tam* action, brought to recover a penalty, and the record was authenticated by the seal of the court and the signature of the clerk, without that of a judge.   Brown et al. v. The State of Maryland, was an indictment for a fine and forfeiture.  . The record in this case, too, was authenticated by the seal of the court and the certificate of the clerk.   The practice is both ways.

·The record, then, according to the judiciary act, and the rule and the practice of the court, is regularly before us.   The more important inquiry is, does it exhibit a case cognizable by this tribunal?

The indictment charges the plaintiff in error, and others, being white persons, with the offence of " residing within the limits of the Cherokee nation without a license," and " without having taken the oath to support and defend the constitution and laws of the state of Georgia."

The defendant in the state court appeared in proper person, and filed the following plea:

" And the said Samuel A. Worcester, in his own proper person, comes and says, that this court ought not to take fur-

VOL. VI.—3 S

ther cognizance of the action and prosecution aforesaid, because, he says, that, on the 15th day of July in the year 1831, he was, and still is, a resident in the Cherokee nation; and that the said supposed crime or crimes, and each of them, were committed, if committed at all, at the town of New Echota, in the said Cherokee nation, out of the jurisdiction of this court, and not in the county Gwinnett, or elsewhere, within the jurisdiction of this court: and this defendant saith, that he is a citizen of the state of Vermont, one of the United States of America, and that he entered the aforesaid Cherokee nation in the capacity of a duly authorised missionary of the American Board of Commissioners for Foreign Missions, under the authority of the president of the United States, and has not since been required by him to leave it: that he was, at the time of his arrest, engaged in preaching the gospel to the Cherokee Indians, and in translating the sacred scriptures into their language, with the permission and approval of the said Cherokee nation, and in accordance with the humane policy of the government of the United States for the civilization and improvement of the Indians; and that his residence there, for this purpose, is the residence charged in the aforesaid indictment: and this defendant further saith, that this prosecution the state of Georgia ought not to have or maintain, because, he saith, that several treaties have, from time to time, been entered into between the United States and the Cherokee nation of Indians, to wit, at Hopewell, on the 28th day of November 1785; at Holston, on the 2d day of July 1791; at Philadelphia, on the 26th day of June 1794; at Tellico, on the 2d day of October 1798; at Tellico, on the 24th day of October 1804; at Tellico, on the 25th day of October 1805; at Tellico, on the 27th day of October 1805; at Washington city, on the 7th day of January 1805; at Washington city, on the 22d day of March 1816; at the Chickasaw Council House, on the 14th day of September 1816; at the Cherokee Agency, on the 8th day of July 1817; and at Washington city, on the 27th day of February 1819: all which treaties have been duly ratified by the senate of the United States of America; and, by which treaties, the United States of America acknowledge the said Cherokee nation to be a sovereign nation, authorised to govern themselves, and all persons who have settled within their territory, free from any right of legislative interference by the several states composing

[Worcester v. The State of Georgia.]

the United States of America, in reference to acts done within their own territory; and, by which treaties, the whole of the territory now occcupied by the Cherokee nation, on the east of the Mississippi, has been solemnly guarantied to them; all of which treaties are existing treaties at this day, and in full force. By these treaties, and particularly by the treaties of Hopewell and Holston, the aforesaid territory is acknowledged to lie without the jurisdiction of the several states composing the union of the United States; and, it is thereby specially stipulated, that the citizens of the United States shall not enter the aforesaid territory, even on a visit, without a passport from the governor of a state, or from some one duly authorised thereto, by the president of the United States: all of which will more fully and at large appear, by reference to the aforesaid treaties. And this defendant saith, that the several acts charged in the bill of indictment were done, or omitted to be done, if at all, within the said territory so recognized as belonging to the said nation, and so, as aforesaid, held by them, under the guarantee of the United States: that, for those acts, the defendant is not amenable to the laws of Georgia, nor to the jurisdiction of the courts of the said state; and that the laws of the state of Georgia, which profess to add the said territory to the several adjacent counties of the said state, and to extend the laws of Georgia over the said territory, and persons inhabiting the same; and, in particular, the act on which this indictment against this defendant is grounded, to wit, 'an act entitled an act to prevent the exercise of assumed and arbitrary power, by all persons, under pretext of authority from the Cherokee Indians, and their laws, and to prevent white persons from residing within that part of the chartered limits of Georgia occupied by the Cherokee Indians, and to provide a guard for the protection of the gold mines, and to enforce the laws of the state within the aforesaid territory,' are repugnant to the aforesaid treaties; which, according to the constitution of the United States, compose a part of the supreme law of the land; and that these laws of Georgia are, therefore, unconstitutional, void, and of no effect; that the said laws of Georgia are also unconstitutional and void, because they impair the obligation of the various contracts formed by and between the aforesaid Cherokee nation and the said United States of America,

as above recited: also, that the said laws of Georgia are uncon-stitutional and void, because they interfere with, and attempt to regulate and control the intercourse with the said Cherokee nation, which, by the said constitution, belongs exclusively to the congress of the United States; and because the said laws are repugnant to the statute of the United States, passed on the —— day of March 1802, entitled 'an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers:' and that, therefore, this court has no juris-diction to cause this defendant to make further or other answer to the said bill of indictment, or further to try and punish this defendant for the said supposed offence or offences alleged in the bill of indictment, or any of them: and, therefore, this de-fendant prays judgment whether he shall be held bound to answer further to said indictment."

This plea was overruled by the court. And the prisoner, being arraigned, plead not guilty. The jury found a verdict against him, and the court sentenced him to hard labour, in the penitentiary, for the term of four years.

By overruling this plea, the court decided that the matter it contained was not a bar to the action. The plea, therefore, must be examined, for the purpose of determining whether it makes a case which brings the party within the provisions of the twenty-fifth section of the "act to establish the judicial courts of the United States."

The plea avers, that the residence, charged in the indict-ment, was under the authority of the president of the United States, and with the permission and approval of the Cherokee nation. That the treaties, subsisting between the United States and the Cherokees, acknowledge their right as a sove-reign nation to govern themselves and all persons who have settled within their territory, free from any right of legislative interference by the several states composing the United States of America. That the act under which the prosecution was instituted is repugnant to the said treaties, and is, therefore, unconstitutional and void. That the said act is, also, uncon-stitutional; because it interferes with, and attempts to regulate and control, the intercourse with the Cherokee nation, which belongs, exclusively, to congress; and, because, also, it is re-pugnant to the statute of the United States, entitled " an act to

[Worcester v. The State of Georgia.]

regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers."

Let the averments of this plea be compared with the twenty-fifth section of the judicial act.

That section enumerates the cases in which the final judgment or decree of a state court may be revised in the supreme court of the United States. These are, " where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity; or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under the United States, and the decision is against the title, right, privilege or exemption, specially set up or claimed by either party under such clause of the said constitution, treaty, statute or commission."

The indictment and plea in this case draw in question, we think, the validity of the treaties made by the United States with the Cherokee Indians; if not so, their construction is certainly drawn in question; and the decision has been, if not against their validity, " against the right, privilege or exemption, specially set up and claimed under them." They also draw into question the validity of a statute of the state of Georgia, " on the ground of its being repugnant to the constitution, treaties and laws of the United States, and the decision is in favour of its validity."

It is, then, we think, too clear for controversy, that the act of congress, by which this court is constituted, has given it the power, and of course imposed on it the duty, of exercising jurisdiction in this case. This duty, however unpleasant, cannot be avoided. Those who fill the judicial department have no discretion in selecting the subjects to be brought before them. We must examine the defence set up in this plea. We must inquire and decide whether the act of the legislature of Georgia, under which the plaintiff in error has been prosecuted and condemned, be consistent with, or repugnant to, the constitution, laws and treaties of the United States.

[Worcester v. The State of Georgia.]

It has been said at the bar, that the acts of the legislature of Georgia seize on the whole Cherokee country, parcel it out among the neighbouring counties of the state, extend her code over the whole country, abolish its institutions and its laws, and annihilate its political existence.

If this be the general effect of the system, let us inquire into the effect of the particular statute and section on which the indictment is founded.

It enacts that " all white persons, residing within the limits of the Cherokee nation on the 1st day of March next, or at any time thereafter, without a license or permit from his excellency the governor, or from such agent as his excellency the governor shall authorise to grant such permit or license, and who shall not have taken the oath hereinafter required, shall be guilty of a high misdemeanour, and, upon conviction thereof, shall be punished by confinement to the penitentiary, at hard labour, for a term not less than four years."

The eleventh section authorises the governor, should he deem it necessary for the protection of the mines, or the enforcement of the laws in force within the Cherokee nation, to raise and organize a guard," &c.

The thirteenth section enacts, "that the said guard or any member of them, shall be, and they are hereby authorised and empowered to arrest any person legally charged with or detected in a violation of the laws of this state, and to convey, as soon as practicable, the person so arrested, before a justice of the peace, judge of the superior, or justice of inferior court of this state, to be dealt with according to law."

The extra-territorial power of every legislature being limited in its action, to its own citizens or subjects, the very passage of this act is an assertion of jurisdiction over the Cherokee nation, and of the rights and powers consequent on jurisdiction.

The first step, then, in the inquiry, which the constitution and laws impose on this court, is an examination of the rightfulness of this claim.

America, separated from Europe by a wide ocean, was inhabited by a distinct people, divided into separate nations, independent of each other and of the rest of the world, having institutions of their own, and governing themselves by their

[Worcester v. The State of Georgia.]

own laws. It is difficult to comprehend the proposition, that the inhabitants of either quarter of the globe could have rightful original claims of dominion over the inhabitants of the other, or over the lands they occupied; or that the discovery of either by the other should give the discoverer rights in the country discovered, which annulled the pre-existing rights of its ancient possessors.

After lying concealed for a series of ages, the enterprise of Europe, guided by nautical science, conducted some of her adventurous sons into this western world. They found it in possession of a people who had made small progress in agriculture or manufactures, and whose general employment was war, hunting, and fishing.

Did these adventurers, by sailing along the coast, and occasionally landing on it, acquire for the several governments to whom they belonged, or by whom they were commissioned, a rightful property in the soil, from the Atlantic to the Pacific; or rightful dominion over the numerous people who occupied it? Or has nature, or the great Creator of all things, conferred these rights over hunters and fishermen, on agriculturists and manufacturers?

But power, war, conquest, give rights, which, after possession, are conceded by the world; and which can never be controverted by those on whom they descend. We proceed, then, to the actual state of things, having glanced at their origin; because holding it in our recollection might shed some light on existing pretensions.

The great maritime powers of Europe discovered and visited different parts of this continent at nearly the same time. The object was too immense for any one of them to grasp the whole; and the claimants were too powerful to submit to the exclusive or unreasonable pretensions of any single potentate. To avoid bloody conflicts, which might terminate disastrously to all, it was necessary for the nations of Europe to establish some principle which all would acknowledge, and which should decide their respective rights as between themselves. This principle, suggested by the actual state of things, was, "that discovery gave title to the government by whose subjects or by whose authority it was made, against all other European

governments, which title might be consummated by pos-
session." 8 Wheat. 573.

This principle, acknowledged by all Europeans, because it
was the interest of all to acknowledge it, gave to the nation
making the discovery, as its inevitable consequence, the sole
right of acquiring the soil and of making settlements on it. It
was an exclusive principle which shut out the right of compe-
tition among those who had agreed to it; not one which could
annul the previous rights of those who had not agreed to it. It
regulated the right given by discovery among the European
discoverers; but could not affect the rights of those already in
possession, either as aboriginal occupants, or as occupants by
virtue of a discovery made before the memory of man. It
gave the exclusive right to purchase, but did not found that
right on a denial of the right of the possessor to sell.

The relation between the Europeans and the natives was
determined in each case by the particular government which
asserted and could maintain this pre-emptive privilege in the
particular place. The United States succeeded to all the claims
of Great Britain, both territorial and political; but no attempt,
so far as is known, has been made to enlarge them. So far as
they existed merely in theory, or were in their nature only
exclusive of the claims of other European nations, they still
retain their original character, and remain dormant. So far
as they have been practically exerted, they exist in fact, are
understood by both parties, are asserted by the one, and ad-
mitted by the other.

Soon after Great Britain determined on planting colonies in
America, the king granted charters to companies of his sub-
jects who associated for the purpose of carrying the views of
the crown into effect, and of enriching themselves. The first
of these charters was made before possession was taken of any
part of the country. They purport, generally, to convey the
soil, from the Atlantic to the South Sea. This soil was occu-
pied by numerous and warlike nations, equally willing and
able to defend their possessions. The extravagant and absurd
idea, that the feeble settlements made on the sea coast, or the
companies under whom they were made, acquired legitimate
power by them to govern the people, or occupy the lands from

sea to sea, did not enter the mind of any man. They were well understood to convey the title which, according to the common law of European sovereigns respecting America, they might rightfully convey, and no more. This was the exclusive right of purchasing such lands as the natives were willing to sell. The crown could not be understood to grant what the crown did not affect to claim; nor was it so understood.

The power of making war is conferred by these charters on the colonies, but *defensive* war alone seems to have been contemplated. In the first charter to the first and second colonies, they are empowered, "for their several *defences*, to encounter, expulse, repel, and resist, all persons who shall, without license," attempt to inhabit "within the said precincts and limits of the said several colonies, or that shall enterprise or attempt at any time hereafter the least detriment or annoyance of the said several colonies or plantations."

The charter to Connecticut concludes a general power to make defensive war with these terms: " and upon *just causes* to invade and destroy the natives or other enemies of the said colony."

The same power, in the same words, is conferred on the government of Rhode Island.

This power to repel invasion, and, upon just cause, to invade and destroy the natives, authorizes offensive as well as defensive war, but only "on just cause." The very terms imply the existence of a country to be invaded, and of an enemy who has given just cause of war.

The charter to William Penn contains the following recital: "and because, in so remote a country, near so many barbarous nations, the incursions, as well of the savages themselves, as of other enemies, pirates, and robbers, may probably be feared, therefore we have given," &c. The instrument then confers the power of war.

These barbarous nations, whose incursions were feared, and to repel whose incursions the power to make war was given, were surely not considered as the subjects of Penn, or occupying his lands during his pleasure.

The same clause is introduced into the charter to Lord Baltimore.

VOL. VI.—3 T

The charter to Georgia professes to be granted for the charitable purpose of enabling poor subjects to gain a comfortable subsistence by cultivating lands in the American provinces, "at present waste and desolate." It recites: "and whereas our provinces in North America have been frequently ravaged by Indian enemies, more especially that of South Carolina, which, in the late war by the neighbouring savages, was laid waste by fire and sword, and great numbers of the English inhabitants miserably massacred; and our loving subjects, who now inhabit there, by reason of the smallness of their numbers, will, in case of any new war, be exposed to the like calamities, inasmuch as their whole southern frontier continueth unsettled, and lieth open to the said savages."

These motives for planting the new colony are incompatible with the lofty ideas of granting the soil, and all its inhabitants from sea to sea. They demonstrate the truth, that these grants asserted a title against Europeans only, and were considered as blank paper so far as the rights of the natives were concerned. The power of war is given only for defence, not for conquest.

The charters contain passages showing one of their objects to be the civilization of the Indians, and their conversion to Christianity—objects to be accomplished by conciliatory conduct and good example; not by extermination.

The actual state of things, and the practice of European nations, on so much of the American continent as lies between the Mississippi and the Atlantic, explain their claims, and the charters they granted. Their pretensions unavoidably interfered with each other; though the discovery of one was admitted by all to exclude the claim of any other, the extent of that discovery was the subject of unceasing contest. Bloody conflicts arose between them, which gave importance and security to the neighbouring nations. Fierce and warlike in their character, they might be formidable enemies, or effective friends. Instead of rousing their resentments, by asserting claims to their lands, or to dominion over their persons, their alliance was sought by flattering professions, and purchased by rich presents. The English, the French, and the Spaniards, were equally competitors for their friendship and their aid. Not well acquainted with the exact meaning of

words, nor supposing it to be material whether they were called the subjects, or the children of their father in Europe; lavish in professions of duty and affection, in return for the rich presents they received; so long as their actual independence was untouched, and their right to self government acknowledged, they were willing to profess dependence on the power which furnished supplies of which they were in absolute need, and restrained dangerous intruders from entering their country: and this was probably the sense in which the term was understood by them.

Certain it is, that our history furnishes no example, from the first settlement of our country, of any attempt on the part of the crown to interfere with the internal affairs of the Indians, farther than to keep out the agents of foreign powers, who, as traders or otherwise, might seduce them into foreign alliances. The king purchased their lands when they were willing to sell, at a price they were willing to take; but never coerced a surrender of them. He also purchased their alliance and dependence by subsidies; but never intruded into the interior of their affairs, or interfered with their self government, so far as respected themselves only.

The general views of Great Britain, with regard to the Indians, were detailed by Mr Stuart, superintendent of Indian affairs, in a speech delivered at Mobile, in presence of several persons of distinction, soon after the peace of 1763. Towards the conclusion he says, "lastly, I inform you that it is the king's order to all his governors and subjects, to treat Indians with justice and humanity, and to forbear all encroachments on the territories allotted to them; accordingly, all individuals are prohibited from purchasing any of your lands; but, as you know that, as your white brethren cannot feed you when you visit them unless you give them ground to plant, it is expected that you will cede lands to the king for that purpose. But, whenever you shall be pleased to surrender any of your territories to his majesty, it must be done, for the future, at a public meeting of your nation, when the governors of the provinces, or the superintendent shall be present, and obtain the consent of all your people. The boundaries of your hunting grounds will be accurately fixed, and no settlement permitted to be made upon them. As you may be assured that all treaties

SUPREME COURT

[Worcester v. The State of Georgia.]

with your people will be faithfully kept, so it is expected that you, also, will be careful strictly to observe them."

The proclamation issued by the king of Great Britain, in 1763, soon after the ratification of the articles of peace, forbids the governors of any of the colonies to grant warrants of survey, or pass patents upon any lands whatever, which, not having been ceded to, or purchased by, us (the king), as aforesaid, are reserved to the said Indians, or any of them.

The proclamation proceeds: "and we do further declare it to be our royal will and pleasure, for the present, as aforesaid, to reserve, under our sovereignty, protection, and dominion, for the use of the said Indians, all the lands and territories lying to the westward of the sources of the rivers which fall into the sea, from the west and northwest as aforesaid: and we do hereby strictly forbid, on pain of our displeasure, all our loving subjects from making any purchases or settlements whatever, or taking possession of any of the lands above reserved, without our special leave and license for that purpose first obtained.

" And we do further strictly enjoin and require all persons whatever, who have, either wilfully or inadvertently, seated themselves upon any lands within the countries above described, or upon any other lands which, not having been ceded to, or purchased by us, are still reserved to the said Indians, as aforesaid, forthwith to remove themselves from such settlements."

A proclamation, issued by Governor Gage, in 1772, contains the following passage: " whereas many persons, contrary to the positive orders of the king, upon this subject, have undertaken to make settlements beyond the boundaries fixed by the treaties made with the Indian nations, which boundaries ought to serve as a barrier between the whites and the said nations; particularly on the Ouabache." The proclamation orders such persons to quit those countries without delay.

Such was the policy of Great Britain towards the Indian nations inhabiting the territory from which she excluded all other Europeans; such her claims, and such her practical exposition of the charters she had granted: she considered them as nations capable of maintaining the relations of peace and war; of governing themselves, under her protection; and she

made treaties with them, the obligation of which she acknowledged.

This was the settled state of things when the war of our revolution commenced. The influence of our enemy was established; her resources enabled her to keep up that influence; and the colonists had much cause for the apprehension that the Indian nations would, as the allies of Great Britain, add their arms to hers. This, as was to be expected, became an object of great solicitude to congress. Far from advancing a claim to their lands, or asserting any right of dominion over them, congress resolved "that the securing and preserving the friendship of the Indian nations appears to be a subject of the utmost moment to these colonies."

The early journals of congress exhibit the most anxious desire to conciliate the Indian nations. Three Indian departments were established; and commissioners appointed in each, "to treat with the Indians in their respective departments, in the name and on the behalf of the United Colonies, in order to preserve peace and friendship with the said Indians, and to prevent their taking any part in the present commotions."

The most strenuous exertions were made to procure those supplies on which Indian friendships were supposed to depend; and every thing which might excite hostility was avoided.

The first treaty was made with the Delawares, in September 1778.

The language of equality in which it is drawn, evinces the temper with which the negotiation was undertaken, and the opinion which then prevailed in the United States.

"1. That all offences or acts of hostilities, by one or either of the contracting parties against the other, be mutually forgiven, and buried in the depth of oblivion, never more to be had in remembrance.

"2. That a perpetual peace and friendship shall, from henceforth, take place and subsist between the contracting parties aforesaid, through all succeeding generations: and if either of the parties are engaged in a just and necessary war, with any other nation or nations, that then each shall assist the other, in due proportion to their abilities, till their enemies are brought to reasonable terms of accommodation," &c.

3. The third article stipulates, among other things, a free

passage for the American troops through the Delaware nation·
and engages that they shall be furnished with provisions and
other necessaries at their value.

"4. For the better security of the peace and friendship now
entered into by the contracting parties against all infractions
of the same by the citizens of either party, to the prejudice of
the other, neither party shall proceed to the infliction of pun-
ishments on the citizens of the other, otherwise than by secur-
ing the offender or offenders, by imprisonment, or any other
competent means, till a fair and impartial trial can be had by
judges or juries of both parties, as near as can be to the laws,
customs and usages of the contracting parties, and natural jus-
tice," &c.

5. The fifth article regulates the trade between the contract-
ing parties, in a manner entirely equal.

6. The sixth article is entitled to peculiar attention, as it
contains a disclaimer of designs which were, at that time, as-
cribed to the United Sta:es, by their enemies, and from the
imputation of which congress was then peculiarly anxious to
free the government. It is in these words: "Whereas the
enemies of the United States have endeavoured, by every arti-
fice in their power, to possess the Indians in general with an
opinion that it is the design of the states aforesaid to extirpate
the Indians, and take possession of their country: to obviate
such false suggestion the United States do engage to guaranty
to the aforesaid nation of Delawares, and their heirs, all their
territorial rights, in the fullest and most ample manner, as it
hath been bounded by former treaties, as long as the said Dela-
ware nation shall abide by, and hold fast the chain of friend-
ship now entered into."

The parties further agree, that other tribes, friendly to the
interest of the United States, may be invited to form a state,
whereof the Delaware nation shall be the heads, and have a
representation in congress.

This treaty, in its language, and in its provisions, is formed,
as near as may be, on the model of treaties between the crown-
ed heads of Europe.

The sixth article shows how congress then treated the inju-
rious calumny of cherishing designs unfriendly to the political
and civil rights of the Indians.

During the war of the revolution, the Cherokees took part with the British. After its termination, the United States, though desirous of peace, did not feel its necessity so strongly as while the war continued. Their political situation being changed, they might very well think it advisable to assume a higher tone, and to impress on the Cherokees the same respect for congress which was before felt for the king of Great Britain. This may account for the language of the treaty of Hopewell. There is the more reason for supposing that the Cherokee chiefs were not very critical judges of the language, from the fact that every one makes his mark; no chief was capable of signing his name. It is probable the treaty was interpreted to them.

The treaty is introduced with the declaration, that " the commissioners plenipotentiary of the United States give peace to all the Cherokees, and receive them into the favour and protection of the United States of America, on the following conditions."

When the United States gave peace, did they not also receive it? Were not both parties desirous of it? If we consult the history of the day, does it not inform us that the United States were at least as anxious to obtain it as the Cherokees? We may ask, further: did the Cherokees come to the seat of the American government to solicit peace; or, did the American commissioners go to them to obtain it? The treaty was made at Hopewell, not at New York. The word " give," then, has no real importance attached to it.

The first and second articles stipulate for the mutual restoration of prisoners, and are of course equal.

The third article acknowledges the Cherokees to be under the protection of the United States of America, and of no other power.

This stipulation is found in Indian treaties, generally. It was introduced into their treaties with Great Britain; and may probably be found in those with other European powers. Its origin may be traced to the nature of their connexion with those powers; and its true meaning is discerned in their relative situation.

The general law of European sovereigns, respecting their claims in America, limited the intercourse of Indians, in a

great degree, to the particular potentate whose ultimate right of domain was acknowledged by the others. This was the general state of things in time of peace. It was sometimes changed in war. The consequence was, that their supplies were derived chiefly from that nation, and their trade confined to it. Goods, indispensable to their comfort, in the shape of presents, were received from the same hand. What was of still more importance, the strong hand of government was interposed to restrain the disorderly and licentious from intrusions into their country, from encroachments on their lands, and from those acts of violence which were often attended by reciprocal murder. The Indians perceived in this protection only what was beneficial to themselves—an engagement to punish aggressions on them. It involved, practically, no claim to their lands, no dominion over their persons. It merely bound the nation to the British crown, as a dependent ally, claiming the protection of a powerful friend and neighbour, and receiving the advantages of that protection, without involving a surrender of their national character.

This is the true meaning of the stipulation, and is undoubtedly the sense in which it was made. Neither the British government, nor the Cherokees, ever understood it otherwise.

The same stipulation entered into with the United States, is undoubtedly to be construed in the same manner. They receive the Cherokee nation into their favour and protection. The Cherokees acknowledge themselves to be under the protection of the United States, and of no other power. Protection does not imply the destruction of the protected. The manner in which this stipulation was understood by the American government, is explained by the language and acts of our first president.

The fourth article draws the boundary between the Indians and the citizens of the United States. But, in describing this boundary, the term "allotted" and the term "hunting ground" are used.

Is it reasonable to suppose, that the Indians, who could not write, and most probably could not read, who certainly were not critical judges of our language, should distinguish the word "allotted" from the words "marked out." The actual subject of contract was the dividing line between the two nations;

[Worcester v. The State of Georgia.]

and their attention may very well be supposed to have been confined to that subject. When, in fact, they were ceding lands to the United States, and describing the extent of their cession, it may very well be supposed that they might not understand the term employed, as indicating that, instead of granting, they were receiving lands. If the term would admit of no other signification, which is not conceded, its being misderstood is so apparent, results so necessarily from the whole transaction; that it must, we think, be taken in the sense in which it was most obviously used.

So with respect to the words "hunting grounds." Hunting was at that time the principal occupation of the Indians, and their land was more used for that purpose than for any other. It could not, however, be supposed, that any intention existed of restricting the full use of the lands they reserved.

To the United States, it could be a matter of no concern, whether their whole territory was devoted to hunting grounds, or whether an occasional village, and an occasional corn field, interrupted, and gave some variety to the scene.

These terms had been used in their treaties with Great Britain, and had never been misunderstood. They had never been supposed to imply a right in the British government to take their lands, or to interfere with their internal government.

The fifth article withdraws the protection of the United States from any citizen who has settled, or shall settle, on the lands allotted to the Indians, for their hunting grounds; and stipulates that, if he shall not remove within six months the Indians may punish him.

The sixth and seventh articles stipulate for the punishment of the citizens of either country, who may commit offences on or against the citizens of the other. The only inference to be drawn from them is, that the United States considered the Cherokees as a nation.

The ninth article is in these words: "for the benefit and comfort of the Indians, and for the prevention of injuries or oppressions on the part of the citizens or Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and *managing all their affairs*, as they think proper."

To construe the expression "managing all their affairs,"

into a surrender of self-government, would be, we think, a perversion of their necessary meaning, and a departure from the construction which has been uniformly put on them. The great subject of the article is the Indian trade. The influence it gave, made it desirable that congress should possess it. The commissioners brought forward the claim, with the profession that their motive was "the benefit and comfort of the Indians, and the prevention of injuries or oppressions." This may be true, as respects the regulation of their trade, and as respects the regulation of all affairs connected with their trade, but cannot be true, as respects the management of all their affairs. The most important of these, are the cession of their lands, and security against intruders on them. Is it credible, that they should have considered themselves as surrendering to the United States the right to dictate their future cessions, and the terms on which they should be made? or to compel their submission to the violence of disorderly and licentious intruders? It is equally inconceivable that they could have supposed themselves, by a phrase thus slipped into an article, on another and most interesting subject, to have divested themselves of the right of self-government on subjects not connected with trade. Such a measure could not be "for their benefit and comfort," or for "the prevention of injuries and oppression." Such a construction would be inconsistent with the spirit of this and of all subsequent treaties; especially of those articles which recognise the right of the Cherokees to declare hostilities, and to make war. It would convert a treaty of peace covertly into an act, annihilating the political existence of one of the parties. Had such a result been intended, it would have been openly avowed.

This treaty contains a few terms capable of being used in a sense which could not have been intended at the time, and which is inconsistent with the practical construction which has always been put on them; but its essential articles treat the Cherokees as a nation capable of maintaining the relations of peace and war; and ascertain the boundaries between them and the United States.

The treaty of Hopewell seems not to have established a solid peace. To accommodate the differences still existing between the state of Georgia and the Cherokee nation, the treaty of

[Worcester v. The State of Georgia.]

Holston was negotiated in July 1791. The existing constitution of the United States had been then adopted, and the government, having more intrinsic capacity to enforce its just claims, was perhaps less mindful of high sounding expressions, denoting superiority. We hear no more of giving peace to the Cherokees. The mutual desire of establishing permanent peace and friendship, and of removing all causes of war, is honestly avowed, and, in pursuance of this desire, the first article declares, that there shall be perpetual peace and friendship between all the citizens of the United States of America and all the individuals composing the Cherokee nation.

The second article repeats the important acknowledgement, that the Cherokee nation is under the protection of the United States of America, and of no other sovereign whosoever.

The meaning of this has been already explained. The Indian nations were, from their situation, necessarily dependent on some foreign potentate for the supply of their essential wants, and for their protection from lawless and injurious intrusions into their country. That power was naturally termed their protector. They had been arranged under the protection of Great Britain: but the extinguishment of the British power in their neighbourhood, and the establishment of that of the United States in its place, led naturally to the declaration, on the part of the Cherokees, that they were under the protection of the United States, and of no other power. They assumed the relation with the United States, which had before subsisted with Great Britain.

This relation was that of a nation claiming and receiving the protection of one more powerful: not that of individuals abandoning their national character, and submitting as subjects to the laws of a master.

The third article contains a perfectly equal stipulation for the surrender of prisoners.

The fourth article declares, that "the boundary between the United States and the Cherokee nation shall be as follows: beginning," &c. We hear no more of "allotments" or of "hunting grounds." A boundary is described, between nation and nation, by mutual consent. The national character of each; the ability of each to establish this boundary, is acknowledged by the other. To preclude for ever all disputes, it is agreed

that it shall be plainly marked by commissioners, to be appointed by each party; and, in order to extinguish for ever all claim of the Cherokees to the ceded lands, an additional consideration is to be paid by the United States. For this additional consideration the Cherokees release all right to the ceded land, for ever.

By the fifth article, the Cherokees allow the United States a road through their country, and the navigation of the Tennessee river. The acceptance of these cessions is an acknowledgement of the right of the Cherokees to make or withhold them.

By the sixth article, it is agreed, on the part of the Cherokees, that the United States shall have the sole and exclusive right of regulating their trade. No claim is made to the management of all their affairs. This stipulation has already been explained. The observation may be repeated, that the stipulation is itself an admission of their right to make or refuse it.

By the seventh article the United States solemnly guaranty to the Cherokee nation all their lands not hereby ceded.

The eighth article relinquishes to the Cherokees any citizens of the United States who may settle on their lands; and the ninth forbids any citizen of the United States to hunt on their lands, or to enter their country without a passport.

The remaining articles are equal, and contain stipulations which could be made only with a nation admitted to be capable of governing itself.

This treaty, thus explicitly recognizing the national character of the Cherokees, and their right of self government; thus guarantying their lands; assuming the duty of protection, and of course pledging the faith of the United States for that protection; has been frequently renewed, and is now in full force.

To the general pledge of protection have been added several specific pledges, deemed valuable by the Indians. Some of these restrain the citizens of the United States from encroachments on the Cherokee country, and provide for the punishment of intruders.

From the commencement of our government, congress has passed acts to regulate trade and intercourse with the Indians; which treat them as nations, respect their rights, and manifest

a firm purpose to afford that protection which treaties stipulate. All these acts, and especially that of 1802, which is still in force, manifestly consider the several Indian nations as distinct political communities, having territorial boundaries, within which their authority is exclusive, and having a right to all the lands within those boundaries, which is not only acknowledged, but guarantied by the United States.

In 1819, congress passed an act for promoting those humane designs of civilizing the neighbouring Indians, which had long been cherished by the executive. It enacts, " that, for the purpose of providing against the further decline and final extinction of the Indian tribes adjoining to the frontier settlements of the United States, and for introducing among them the habits and arts of civilization, the president of the United States shall be, and he is hereby authorized, in every case where he shall judge improvement in the habits and condition of such Indians practicable, and that the means of instruction can be introduced *with their own consent*, to employ capable persons, of good moral character, to instruct them in the mode of agriculture suited to their situation; and for teaching their children in reading, writing and arithmetic; and for performing such other duties as may be enjoined, according to such instructions and rules as the president may give and prescribe for the regulation of their conduct in the discharge of their duties."

This act avowedly contemplates the preservation of the Indian nations as an object sought by the United States, and proposes to effect this object by civilizing and converting them from hunters into agriculturists. Though the Cherokees had already made considerable progress in this improvement, it cannot be doubted that the general words of the act comprehend them. Their advance in the " habits and arts of civilization," rather encouraged perseverance in the laudable exertions still farther to meliorate their condition. This act furnishes strong additional evidence of a settled purpose to fix the Indians in their country by giving them security at home.

The treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the union.

[Worcester v. The State of Georgia.]

Is this the rightful exercise of power, or is it usurpation?

While these states were colonies, this power, in its utmost extent, was admitted to reside in the crown. When our revolutionary struggle commenced, congress was composed of an assemblage of deputies acting under specific powers granted by the legislatures, or conventions of the several colonies. It was a great popular movement, not perfectly organized; nor were the respective powers of those who were entrusted with the management of affairs accurately defined. The necessities of our situation produced a general conviction that those measures which concerned all, must be transacted by a body in which the representatives of all were assembled, and which could command the confidence of all: congress, therefore, was considered as invested with all the power of war and peace, and congress dissolved our connexion with the mother country, and declared these United Colonies to be independent states. Without any written definition of powers, they employed diplomatic agents to represent the United States at the several courts of Europe; offered to negotiate treaties with them, and did actually negotiate treaties with France. From the same necessity, and on the same principles, congress assumed the management of Indian affairs; first in the name of these United Colonies; and, afterwards, in the name of the United States. Early attempts were made at negotiation, and to regulate trade with them. These not proving successful, war was carried on under the direction, and with the forces of the United States, and the efforts to make peace, by treaty, were earnest and incessant. The confederation found congress in the exercise of the same powers of peace and war, in our relations with Indian nations, as with those of Europe.

Such was the state of things when the confederation was adopted. That instrument surrendered the powers of peace and war to congress, and prohibited them to the states, respectively, unless a state be actually invaded, " or shall have received certain advice of a resolution being formed by some nation of Indians to invade such state, and the danger is so imminent as not to admit of delay till the United States in congress assembled can be consulted." This instrument also gave the United States in congress assembled the sole and exclusive right of " regulating the trade and managing all the affairs with the Indians, not

members of any of the states: provided, that the legislative power of any state within its own limits be not infringed or violated."

The ambiguous phrases which follow the grant of power to the United States, were so construed by the states of North Carolina and Georgia as to annul the power itself. The discontents and confusion resulting from these conflicting claims, produced representations to congress, which were referred to a committee, who made their report in 1787. The report does not assent to the construction of the two states, but recommends an accommodation, by liberal cessions of territory, or by an admission, on their part, of the powers claimed by congress. The correct exposition of this article is rendered unnecessary by the adoption of our existing constitution. That instrument confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several states, and *with the Indian tribes.* These powers comprehend all that is required for the regulation of our intercourse with the Indians. They are not limited by any restrictions on their free actions. The shackles imposed on this power, in the confederation, are discarded.

The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed: and this was a restriction which those European potentates imposed on themselves, as well as on the Indians. The very term " nation," so generally applied to them, means " a people distinct from others." The constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits their rank among those powers who are capable of making treaties. The words " treaty" and " nation" are words of our own language, selected in our diplomatic and legislative proceedings, by ourselves, having each a definite and well understood meaning. We

have applied them to Indians, as we have applied them to the other nations of the earth. They are applied to all in the same sense.

Georgia, herself, has furnished conclusive evidence that her former opinions on this subject concurred with those entertained by her sister states, and by the government of the United States. Various acts of her legislature have been cited in the argument, including the contract of cession made in the year 1802, all tending to prove her acquiescence in the universal conviction that the Indian nations possessed a full right to the lands they occupied, until that right should be extinguished by the United States, with their consent: that their territory was separated from that of any state within whose chartered limits they might reside, by a boundary line, established by treaties: that, within their boundary, they possessed rights with which no state could interfere: and that the whole power of regulating the intercourse with them, was vested in the United States. A review of these acts, on the part of Georgia, would occupy too much time, and is the less necessary, because they have been accurately detailed in the argument at the bar. Her new series of laws, manifesting her abandonment of these opinions, appears to have commenced in December 1828.

In opposition to this original right, possessed by the undisputed occupants of every country; to this recognition of that right, which is evidenced by our history, in every change through which we have passed; is placed the charters granted by the monarch of a distant and distinct region, parcelling out a territory in possession of others whom he could not remove and did not attempt to remove, and the cession made of his claims by the treaty of peace.

The actual state of things at the time, and all history since, explain these charters; and the king of Great Britain, at the treaty of peace, could cede only what belonged to his crown. These newly asserted titles can derive no aid from the articles so often repeated in Indian treaties; extending to them, first, the protection of Great Britain, and afterwards that of the United States. These articles are associated with others, recognizing their title to self government. The very fact of repeated treaties with them recognizes it; and the settled doc-

trine of the law of nations is, that a weaker power does not surrender its independence—its right to self government, by associating with a stronger, and taking its protection. A weak state, in order to provide for its safety, may place itself under the protection of one more powerful, without stripping itself of the right of government, and ceasing to be a state. Examples of this kind are not wanting in Europe. "Tributary and feudatory states," says Vattel, "do not thereby cease to be sovereign and independent states, so long as self government and sovereign and independent authority are left in the administration of the state." At the present day, more than one state may be considered as holding its right of self government under the guarantee and protection of one or more allies.

The Cherokee nation, then, is a distinct community occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States.

The act of the state of Georgia, under which the plaintiff in error was prosecuted, is consequently void, and the judgment a nullity. Can this court revise, and reverse it?

If the objection to the system of legislation, lately adopted by the legislature of Georgia, in relation to the Cherokee nation, was confined to its extra-territorial operation, the objection, though complete, so far as respected mere right, would give this court no power over the subject. But it goes much further. If the review which has been taken be correct, and we think it is, the acts of Georgia are repugnant to the constitution, laws, and treaties of the United States.

They interfere forcibly with the relations established between the United States and the Cherokee nation, the regulation of which, according to the settled principles of our constitution, are committed exclusively to the government of the union.

They are in direct hostility with treaties, repeated in a succession of years, which mark out the boundary that separates

the Cherokee country from Georgia; guaranty to them all the land within their boundary; solemnly pledge the faith of the United States to restrain their citizens from trespassing on it; and recognize the pre-existing power of the nation to govern itself.

They are in equal hostility with the acts of congress for regulating this intercourse, and giving effect to the treaties.

The forcible seizure and abduction of the plaintiff in error, who was residing in the nation with its permission, and by authority of the president of the United States, is also a violation of the acts which authorise the chief magistrate to exercise this authority.

Will these powerful considerations avail the plaintiff in error? We think they will. He was seized, and forcibly carried away, while under guardianship of treaties guarantying the country in which he resided, and taking it under the protection of the United States. He was seized while performing, under the sanction of the chief magistrate of the union, those duties which the humane policy adopted by congress had recommended. He was apprehended, tried, and condemned, under colour of a law which has been shown to be repugnant to the constitution, laws, and treaties of the United States. Had a judgment, liable to the same objections, been rendered for property, none would question the jurisdiction of this court. It cannot be less clear when the judgment affects personal liberty, and inflicts disgraceful punishment, if punishment could disgrace when inflicted on innocence. The plaintiff in error is not less interested in the operation of this unconstitutional law than if it affected his property. He is not less entitled to the protection of the constitution, laws, and treaties of his country.

This point has been elaborately argued and, after deliberate consideration, decided, in the case of Cohens v. The Commonwealth of Virginia, 6 Wheat. 264.

It is the opinion of this court that the judgment of the superior court for the county of Gwinnett, in the state of Georgia, condemning Samuel A. Worcester to hard labour, in the penitentiary of the state of Georgia, for four years, was pronounced by that court under colour of a law which is void, as being repugnant to the constitution, treaties, and laws of the

United States, and ought, therefore, to be reversed and annulled.

Mr Justice M'LEAN.

As this case involves principles of the highest importance, and may lead to consequences which shall have an enduring influence on the institutions of this country; and as there are some points in the case on which I wish to state, distinctly, my opinion, I embrace the privilege of doing so.

With the decision, just given, I concur.

The plaintiff in error was indicted under a law of Georgia, "for residing in that part of the Cherokee nation attached, by the laws of said state, to the county of Gwinnett, without a license or permit from his excellency the governor of the state, or from any agent authorised by his excellency the governor to grant such permit or license, and without having taken the oath to support and defend the constitution and laws of the state of Georgia, and uprightly to demean himself as a citizen thereof."

On this indictment the defendant was arrested, and, on being arraigned before the superior court for Gwinnett county, he filed, in substance, the following plea:

He admits that, on the 15th of July 1831, he was, and still continued to be, a resident in the Cherokee nation, and that the crime, if any were committed, was committed at the town of New Echota, in said nation, out of the jurisdiction of the court. That he is a citizen of Vermont, and that he entered the Indian country in the capacity of a duly authorised missionary of the American Board of Commissioners for Foreign Missions, under the authority of the president of the United States, and has not since been required by him to leave it. That he was, at the time of his arrest, engaged in preaching the gospel to the Cherokee Indians, and in translating the sacred Scriptures into their language, with the permission and approval of the Cherokee nation, and in accordance with the humane policy of the government of the United States, for the improvement of the Indians.

He then states, as a bar to the prosecution, certain treaties made between the United States and the Cherokee Indians, by

which the possession of the territory they now inhabit was solemnly guarantied to them; and also a certain act of congress, passed in March 1802, entitled " an act to regulate trade and intercourse with the Indian tribes." He also alleges, that this subject, by the constitution of the United States, is exclusively vested in congress; and that the law of Georgia, being repugnant to the constitution of the United States, to the treaties referred to, and to the act of congress specified, is void, and cannot be enforced against him.

This plea was overruled by the court, and the defendant pleaded not guilty.

The jury returned a verdict of guilty; and the defendant was sentenced, by the court, to be kept in close custody, by the sheriff of the county, until he could be transported to the penitentiary of the state, and the keeper thereof was directed to receive him into custody, and keep him at hard labour in the penitentiary, during the term of four years.

Another individual was included in the same indictment, and joined in the plea to the jurisdiction of the court, and was also included in the sentence; but his name is not adverted to, because the principles of the case are fully presented in the above statement.

To reverse this judgment, a writ of error was obtained, which, having been returned, with the record of the proceedings, is now before this court.

The first question which it becomes necessary to examine, is, whether the record has been duly certified, so as to bring the proceedings regularly before this tribunal.

A writ of error was allowed, in this case, by one of the justices of this court, and the requisite security taken. A citation was also issued, in the form prescribed, to the state of Georgia, a true copy of which, as appears by the oath of William Patten, was delivered to the governor, on the 24th day of November last; and another true copy was delivered, on the 22d day of the same month, to the attorney-general of the state.

The record was returned by the clerk, under the seal of the court, who certifies that it is a full and complete exemplification of the proceedings and judgment had in the case; and he

further certifies, that the original bond, and a copy of the writ of error, were duly deposited and filed in the clerk's office of said court, on the 10th day of November last.

Is it necessary, in such a case, that the record should be certified by the judge who held the court?

In the case of Martin v. Hunter's Lessee, which was a writ of error to the court of appeals of Virginia, it was objected that the return to the writ of error was defective, because the record was not so certified; but the court, in that case, said, "the forms of process, and the modes of proceeding in the exercise of jurisdiction, are, with few exceptions, left by the legislature to be regulated and changed as this court may, in its discretion, deem expedient." By a rule of this court, "the return of a copy of a record of the proper court, annexed to the writ of error, is declared to be a sufficient compliance with the mandate of the writ. The record, in this case, is duly certified by the clerk of the court of appeals, and annexed to the writ of error. The objection, therefore, which has been urged to the sufficiency of the return, cannot prevail."—1 Wheat. 304.

In 9 Wheat. 526, in the case of Stewart v. Ingle and others, which was a writ of error to the circuit court for the district of Columbia, a certiorari was issued, upon a suggestion of diminution in the record, which was returned by the clerk with another record; whereupon, a motion was made for a new certiorari, on the ground that the return ought to have been made by the judge of the court below, and not by the clerk. The writ of certiorari, it is known, like the writ of error, is directed to the court.

Mr Justice Washington, after consultation with the judges, stated that, according to the rules and practice of the court, a return made by the clerk was a sufficient return.

To ascertain what has been the general course of practice on this subject, an examination has been made into the manner in which records have been certified from state courts to this court; and it appears that, in the year 1817, six causes were certified, in obedience to writs of error, by the clerk, under the seal of the court. In the year 1819, two were so certified, one of them being the case of M'Cullough v. The State of Maryland.

In the year 1821, three cases were so certified; and in the year 1823, there was one. In 1827, there were five, and in the ensuing year, seven.

In the year 1830, there were eight causes so certified, in five of which, a state was a party on the record. There were three causes thus certified in the year 1831, and five in the present year.

During the above periods, there were only fifteen causes from state courts, where the records were certified by the court or the presiding judge, and one of these was the case of Cohens v. The State of Virginia.

This court adopted the following rule on this subject in 1797:

"It is ordered by the court, that the clerk of the court to which any writ of error shall be directed, may make the return of the same, by transmitting a true copy of the record, and of all proceedings in the cause, under his hand, and the seal of the court."

The power of the court to adopt this rule, cannot be questioned: and it seems to have regulated the practice ever since its adoption. In some cases, the certificate of the court, or the presiding judge, has been affixed to the record; but this court has decided, where the question has been raised, that such certificate is unnecessary.

So far as the authentication of the record is concerned, it is impossible to make a distinction between a civil and a criminal case. What may be sufficient to authenticate the proceedings in a civil case, must be equally so in a criminal one. The verity of the record is of as much importance in the one case as the other.

This is a question of practice; and it would seem that, if any one point in the practice of this court can be considered as settled, this one must be so considered.

In the progress of the investigation, the next inquiry which seems naturally to arise, is, whether this is a case in which a writ of error may be issued.

By the twenty-fifth section of the judiciary act of 1789, it is provided, "that a final judgment or decree in any suit in the highest court of law or equity of a state, in which a decision in the suit could be had, where is drawn in question the valid-

ity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any state, on the ground of their being repugnant to the constitution, treaties, or laws, of the United States, and the decision is in favour of such their validity; or where is drawn in question the construction of any clause of the constitution, or of a treaty or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption, specially set up or claimed by either party, under such clause of the said constitution, treaty, statute, or commission, may be re-examined, and reversed or affirmed, in the supreme court of the United States."

Doubts have been expressed whether a writ of error to a state court is not limited to civil cases. These doubts could not have arisen from reading the above section. Is not a criminal case, as much a suit as a civil case. What is a suit, but a prosecution; and can any one suppose that it was the intention of congress, in using the word suit, to make a distinction between a civil prosecution and a criminal one.

It is more important that jurisdiction should be given to this court in criminal than in civil cases, under the twenty-fifth section of the judiciary act. Would it not be inconsistent, both with the spirit and letter of this law, to revise the judgment of a state court, in a matter of controversy respecting damages, where the decision is against a right asserted under the constitution or a law of the United States; but to deny the jurisdiction, in a case where the property, the character, the liberty and life of a citizen may be destroyed, though protected by the solemn guarantees of the constitution?

But this is not an open question; it has long since been settled by the solemn adjudications of this court. The above construction, therefore, is sustained both on principle and authority. The provisions of the section apply as well to criminal as to civil cases, where the constitution, treaties, or laws of the United States come in conflict with the laws of a state; and the latter is sustained by the decision of the court.

It has been said, that this court can have no power to arrest

the proceedings of a state tribunal in the enforcement of the criminal laws of the state. This is undoubtedly true, so long as a state court, in the execution of its penal laws, shall not infringe upon the constitution of the United States, or some treaty or law of the union.

Suppose a state should make it penal for an officer of the United States to discharge his duties within its jurisdiction; as, for instance, a land officer, an officer of the customs, or a postmaster, and punish the offender by confinement in the penitentiary: could not the supreme court of the United States interpose their power, and arrest or reverse the state proceedings? Cases of this kind are so palpable, that they need only to be stated to gain the assent of every judicious mind. And would not this be an interference with the administration of the criminal laws of a state?

This court have repeatedly decided, that they have no appellate jurisdiction in criminal cases from the circuit courts of the United States: writs of error and appeals are given from those courts only in civil cases. But, even in those courts, where the judges are divided on any point, in a criminal case, the point may be brought before this court, under a general provision in cases of division of opinion.

Jurisdiction is taken in the case under consideration exclusively by the provisions of the twenty-fifth section of the law which has been quoted. These provisions, as has been remarked, apply, indiscriminately, to criminal and civil cases, wherever a right is claimed under the constitution, treaties, or laws of the United States, and the decision, by the state court, is against such right. In the present case, the decision was against the right expressly set up by the defendant, and it was made by the highest judicial tribunal of Georgia.

To give jurisdiction in such a case, this court need look no further than to ascertain whether the right, thus asserted, was decided against by the state court. The case is clear of difficulty on this point.

The name of the state of Georgia is used in this case, because such was the designation given to the cause in the state court. No one ever supposed, that the state, in its sovereign capacity, in such a case, is a party to the cause. The form of

[Worcester v. The State of Georgia.]

the prosecution here must be the same as it was in the state court; but so far as the name of the state is used, it is matter of form. Under a rule of this court, notice was given to the governor and attorney-general of the state, because it is a part of their duty to see that the laws of the state are executed.

In prosecutions for violations of the penal laws of the union, the name of the United States is used in the same manner. Whether the prosecution be under a federal or state law, the defendant has a right to question the constitutionality of the law.

Can any doubt exist as to the power of congress to pass the law, under which jurisdiction is taken in this case? Since its passage, in 1789, it has been the law of the land; and has been sanctioned by an uninterrupted course of decisions in this court, and acquiesced in by the state tribunals, with perhaps a solitary exception: and whenever the attention of the national legislature has been called to the subject, their sanction has been given to the law by so large a majority as to approach almost to unanimity.

Of the policy of this act there can be as little doubt as of the right of congress to pass it.

The constitution of the United States was formed, not, in my opinion, as some have contended, by the people of the United States, nor, as others, by the states; but by a combined power, exercised by the people, through their delegates, limited in their sanctions, to the respective states.

Had the constitution emanated from the people, and the states had been referred to, merely as convenient districts, by which the public expression could be ascertained, the popular vote throughout the union would have been the only rule for the adoption of the constitution. This course was not pursued; and in this fact, it clearly appears that our fundamental law was not formed, exclusively, by the popular suffrage of the people.

The vote of the people was limited to the respective states in which they resided. So that it appears there was an expression of popular suffrage and state sanction, most happily united, in the adoption of the constitution of the union.

Whatever differences of opinion may exist, as to the means

Vol. VI.—3 W

by which the constitution was adopted, there would seem to be no ground for any difference as to certain powers conferred by it.

Three co-ordinate branches of the government were established; the executive, legislative, and judicial. These branches are essential to the existence of any free government, and that they should possess powers, in their respective spheres, co-extensive with each other.

If the executive have not powers which will enable him to execute the functions of his office, the system is essentially defective; as those duties must, in such case, be discharged by one of the other branches. This would destroy that balance which is admitted to be essential to the existence of free government, by the wisest and most enlightened statesmen of the present day.

It is not less important that the legislative power should be exercised by the appropriate branch of the government, than that the executive duties should devolve upon the proper functionary. And if the judicial power fall short of giving effect to the laws of the union, the existence of the federal government is at an end.

It is in vain, and worse than in vain, that the national legislature enact laws, if those laws are to remain upon the statute book as monuments of the imbecility of the national power. It is in vain that the executive is called to superintend the execution of the laws, if he have no power to aid in their enforcement.

Such weakness and folly are, in no degree, chargeable to the distinguished men through whose instrumentality the constitution was formed. The powers given, it is true, are limited; and no powers, which are not expressly given, can be exercised by the federal government: but, where given, they are supreme. Within the sphere allotted to them, the co-ordinate branches of the general government revolve, unobstructed by any legitimate exercise of power by the state governments. The powers exclusively given to the federal government are limitations upon the state authorities. But, with the exception of these limitations, the states are supreme; and their sovereignty can be no more invaded by the action of the general government, than the action of the state governments in arrest or obstruct the course of the national power.

It has been asserted that the federal government is foreign to the state governments; and that it must consequently be hostile to them. Such an opinion could not have resulted from a thorough investigation of the great principles which lie at the foundation of our system. The federal government is neither foreign to the state governments, nor is it hostile to them. It proceeds from the same people, and is as much under their control as the state governments.

Where, by the constitution, the power of legislation is exclusively vested in congress, they legislate for the people of the union, and their acts are as binding as are the constitutional enactments of a state legislature on the people of the state. If this were not so, the federal government would exist only in name. Instead of being the proudest monument of human wisdom and patriotism, it would be the frail memorial of the ignorance and mental imbecility of its framers.

In the discharge of his constitutional duties, the federal executive acts upon the people of the union, the same as a governor of a state, in the performance of his duties, acts upon the people of the state. And the judicial power of the United States acts in the same manner on the people. It rests upon the same basis as the other departments of the government. The powers of each are derived from the same source, and are conferred by the same instrument. They have the same limitations and extent.

The supreme court of a state, when required to give effect to a statute of the state, will examine its constitution, which they are sworn to maintain, to see if the legislative act be repugnant to it; and if a repugnancy exist, the statute must yield to the paramount law.

The same principle governs the supreme tribunal of the union. No one can deny, that the constitution of the United States is the supreme law of the land; and consequently, no act of any state legislature, or of congress, which is repugnant to it, can be of any validity.

Now if an act of a state legislature be repugnant to the constitution of the state, the state court will declare it void; and if such act be repugnant to the constitution of the union, or a law made under that constitution, which is declared to be the supreme law of the land, is it not equally void? And, under

such circumstances, if this court should shrink from a discharge of their duty, in giving effect to the supreme law of the land, would they not violate their oaths, prove traitors to the constitution, and forfeit all just claim to the public confidence?

It is sometimes objected, if the federal judiciary may declare an act of a state legislature void, because it is repugnant to the constitution of the United States, it places the legislation of a state within the power of this court. And might not the same argument be urged with equal force against the exercise of a similar power, by the supreme court of a state. Such an argument must end in the destruction of all constitutions, and the will of the legislature, like the acts of the parliament of Great Britain, must be the supreme, and only law of the land.

It is impossible to guard an investiture of power so that it may not, in some form, be abused: an argument, therefore, against the exercise of power, because it is liable to abuse, would go to the destruction of all governments.

The powers of this court are expressly, not constructively, given by the constitution; and within this delegation of power, this court are the supreme court of the people of the United States, and they are bound to discharge their duties, under the same responsibilities as the supreme court of a state; and are equally, within their powers, the supreme court of the people of each state.

When this court are required to enforce the laws of any state, they are governed by those laws. So closely do they adhere to this rule, that during the present term, a judgment of a circuit court of the United States, made in pursuance of decisions of this court, has been reversed and annulled, because it did not conform to the decisions of the state court, in giving a construction to a local law. But while this court conforms its decisions to those of the state courts, on all questions arising under the statutes and constitutions of the respective states, they are bound to revise and correct those decisions, if they annul, either the constitution of the United States, or the laws made under it.

It appears, then, that on all questions arising under the laws of a state, the decisions of the courts of such state form a rule for the decisions of this court, and that on all questions arising under the laws of the United States, the decisions of this court

form a rule for the decisions of the state courts. Is there any thing unreasonable in this? Have not the federal, as well as the state courts, been constituted by the people? Why then should one tribunal more than the other, be deemed hostile to the interests of the people.

In the second section of the third article of the constitution, it is declared, that "the judicial power shall extend to all cases, in law and equity, arising under the constitution, the laws of the United States, and treaties made, or which shall be made, under their authority.

Having shown that a writ of error will lie in this case, and that the record has been duly certified, the next inquiry that arises is, what are the acts of the United States which relate to the Cherokee Indians and the acts of Georgia; and were these acts of the United States sanctioned by the federal constitution?

Among the enumerated powers of congress, contained in the eighth section of the first article of the constitution, it is declared "that congress shall have power to regulate commerce with foreign nations, and among the Indian tribes." By the articles of confederation, which were adopted on the 9th day of July 1778, it was provided "that the United States, in congress assembled, shall also have the sole and exclusive right and power of regulating the alloy and value of coin struck, by their own authority, or by that of the respective states; fixing the standard of weights and measures throughout the United States; regulating the trade and management of all affairs with the Indians, not members of any of the states: Provided, that the legislative right of any state, within its own limits, be not infringed or violated."

As early as June 1775, and before the adoption of the articles of confederation, congress took into their consideration the subject of Indian affairs. The Indian country was divided into three departments, and the superintendence of each was committed to commissioners, who were authorised to hold treaties with the Indians, make disbursements of money for their use, and to discharge various duties, designed to preserve peace and cultivate a friendly feeling with them towards the colonies. No person was permitted to trade with them with-

[Worcester v. The State of Georgia.]

out a license from one or more of the commissioners of the respective departments.

In April 1776, it was "resolved, that the commissioners of Indian affairs in the middle department, or any one of them, be desired to employ, for reasonable salaries, a minister of the gospel, to reside among the Delaware Indians, and instruct them in the Christian religion; a school master, to teach their youth reading, writing, and arithmetic; also, a blacksmith, to do the work of the Indians." The general intercourse with the Indians continued to be managed under the superintendence of the continental congress.

On the 28th of November 1785, the treaty of Hopewell was formed, which was the first treaty made with the Cherokee Indians. The commissioners of the United States were required to give notice to the executives of Virginia, North Carolina, South Carolina and Georgia, in order that each might appoint one or more persons to attend the treaty, but they seem to have had no power to act on the occasion.

In this treaty it is stipulated, that "the commissioners plenipotentiary of the United States in congress assembled, give peace to all the Cherokees, and receive them into the favour and protection of the United States of America, on the following conditions:"

1. The Cherokees to restore all prisoners and property taken during the war.

2. The United States to restore to the Cherokees all prisoners.

3. The Cherokees acknowledge themselves to be under the protection of the United States, and of no other sovereign whatsoever.

4. The boundary line between the Cherokees and the citizens of the United States was agreed to as designated.

5. If any person, not being an Indian, intrude upon the land "allotted" to the Indians, or, being settled on it, shall refuse to remove within six months after the ratification of the treaty, he forfeits the protection of the United States, and the Indians were at liberty to punish him as they might think proper.

6. The Indians are bound to deliver up to the United States any Indian who shall commit robbery, or other capital crime, on a white person living within their protection.

7. If the same offence be committed on an Indian by a citizen of the United States, he is to be punished.

8. It is understood that the punishment of the innocent, under the idea of retaliation, is unjust, and shall not be practised on either side, except where there is a manifest violation of this treaty; and then it shall be preceded, first, by a demand of justice; and, if refused, then by a declaration of hostilities.

"That the Indians may have full confidence in the justice of the United States respecting their interests, they shall have a right to send a deputy of their choice, whenever they think fit, to congress."

The treaty of Holston was entered into with the same people, on the 2d day of July 1791.

This was a treaty of peace, in which the Cherokees again placed themselves under the protection of the United States, and engaged to hold no treaty with any foreign power, individual state, or with individuals of any state. Prisoners were agreed to be delivered up on both sides; a new Indian boundary was fixed; and a cession of land made to the United States on the payment of a stipulated consideration.

A free, unmolested road, was agreed to be given through the Indian lands, and the free navigation of the Tennessee river. It was agreed that the United States should have the exclusive right of regulating their trade, and a solemn guarantee of their land, not ceded, was made. A similar provision was made, as to the punishment of offenders, and as to all persons who might enter the Indian territory, as was contained in the treaty of Hopewell. Also, that reprisal or retaliation shall not be committed, until satisfaction shall have been demanded of the aggressor.

On the 7th day of August 1786, an ordinance for the regulation of Indian affairs was adopted, which repealed the former system.

In 1794 another treaty was made with the Cherokees, the object of which was to carry into effect the treaty of Holston. And on the plains of Tellico, on the 2d of October 1798, the Cherokees, in another treaty, agreed to give a right of way, in a certain direction, over their lands. Other engagements were also entered into, which need not be referred to.

Various other treaties were made by the United States with

the Cherokee Indians, by which, among other arrangements, cessions of territory were procured and boundaries agreed on.

In a treaty made in 1817, a distinct wish is expressed by the Cherokees, to assume a more regular form of government, in which they are encouraged by the United States. By a treaty held at Washington, on the 27th day of February 1819, a reservation of land is made by the Cherokees for a school fund, which was to be surveyed and sold by the United States for that purpose. And it was agreed, that all white persons, who had intruded on the Indian lands, should be removed.

To give effect to various treaties with this people, the power of the executive has frequently been exercised; and at one time General Washington expressed a firm determination to resort to military force to remove intruders from the Indian territories.

On the 30th of March 1802, congress passed an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers.

In this act it is provided, that any citizen or resident in the United States, who shall enter into the Indian lands to hunt, or for any other purpose, without a license, shall be subject to a fine and imprisonment. And if any person shall attempt to survey, or actually survey, the Indian lands, he shall be liable to forfeit a sum not exceeding one thousand dollars, and be imprisoned not exceeding twelve months. No person is permitted to reside as a trader within the Indian boundaries, without a license or permit. All persons are prohibited, under a heavy penalty, from purchasing the Indian lands; and all such purchases are declared to be void. And it is made lawful for the military force of the United States to arrest offenders against the provisions of the act.

By the seventeenth section, it is provided, that the act shall not be so construed as to "prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states; or the unmolested use of a road, from Washington district to Mero district, or to prevent the citizens of Tennessee from keeping in repair said road." Nor was the act to be so construed as to prevent persons from travelling from Knoxville to Price's settlement,

[Worcester v. The State of Georgia.]

provided they shall travel in the tract or path which is usually travelled, and the Indians do not object; but if they object, then all travel on this road to be prohibited, after proclamation by the president, under the penalties provided in the act.

Several acts, having the same object in view, were passed prior to this one; but as they were repealed either before, or by the act of 1802, their provisions need not be specially noticed.

The acts of the state of Georgia, which the plaintiff in error complains of, as being repugnant to the constitution, treaties, and laws of the United States, are found in two statutes.

The first act was passed the 12th of December 1829; and is entitled " an act to add the territory lying within the chartered limits of Georgia, and now in the occupancy of the Cherokee Indians, to the counties of Carroll, Dekalb, Gwinnett and Habersham; and to extend the laws of the state over the same, and to annul all laws made by the Cherokee nation of Indians, and to provide for the compensation of officers serving legal process in said territory, and to regulate the testimony of Indians, and to repeal the ninth section of the act of 1828 on this subject."

This act annexes the territory of the Indians, within the limits of Georgia, to the counties named in the title; and extends the jurisdiction of the state over it. It annuls the laws, ordinances, orders and regulations, of any kind, made by the Cherokees, either in council or in any other way, and they are not permitted to be given in evidence in the courts of the state. By this law, no Indian, or the descendant of an Indian, residing within the Creek or Cherokee nation of Indians, shall be deemed a competent witness in any court of the state, to which a white person may be a party, except such white person reside within the nation. Offences under the act a. be punished by confinement in the penitentiary, in some cases not less than four nor more than six years, and in others not exceeding four years.

The second act was passed on the 22d day of December 1830, and is entitled " an act to prevent the exercise of assumed and arbitrary power, by all persons, on pretext of authority from the Cherokee Indians and their laws; and to prevent white persons from residing within that part of the

chartered limits of Georgia, occupied by the Cherokee Indians; and to provide a guard for the protection of the gold mines, and to enforce the laws of the state within the aforesaid territory."

By the first section of this act, it is made a penitentiary offence, after the 1st day of February 1831, for any person or persons, under colour or pretence of authority from the said Cherokee tribe, or as headmen, chiefs or warriors of said tribe, to cause or procure, by any means, the assembling of any council or other pretended legislative body of the said Indians; for the purpose of legislating, &c.

They are prohibited from making laws, holding courts of justice, or executing process. And all white persons, after the 1st of March 1831, who shall reside within the limits of the Cherokee nation, without a license or permit from his excellency the governor, or from such agent as his excellency the governor shall authorize to grant such permit or license, or who shall not have taken the oath hereinafter required, shall be guilty of a high misdemeanour; and, upon conviction thereof, shall be punished by confinement to the penitentiary at hard labour, for a term not less than four years. From this punishment, agents of the United States are excepted, white females, and male children under twenty-one years of age.

Persons who have obtained license, are required to take the following oath: " I, A. B., do solemnly swear, that I will support and defend the constitution and laws of the state of Georgia, and uprightly demean myself as a citizen thereof. So help me God."

The governor is authorized to organize a guard, which shall not consist of more than sixty persons, to protect the mines in the Indian territory, and the guard is authorized to arrest all offenders under the act.

It is apparent that these laws are repugnant to the treaties with the Cherokee Indians which have been referred to, and to the law of 1802. This repugnance is made so clear by an exhibition of the respective acts, that no force of demonstration can make it more palpable.

By the treaties and laws of the United States, rights are guarantied to the Cherokees, both as it respects their territory and internal polity. By the laws of Georgia these rights are

[Worcester v. The State of Georgia.]

abolished; and not only abolished, but an ignominious punishment is inflicted on the Indians and others; for the exercise of them. The important question then arises, which shall stand, the laws of the United States, or the laws of Georgia? No rule of construction, or subtlety of argument, can evade an answer to this question. The response must be, so far as the punishment of the plaintiff in error is concerned, in favour of the one or the other.

Not to feel the full weight of this momentous subject, would evidence an ignorance of that high responsibility which is devolved upon this tribunal, and upon its humblest member, in giving a decision in this case.

Are the treaties and law which have been cited, in force? and what, if any, obligations, do they impose on the federal government within the limits of Georgia?

A reference has been made to the policy of the United States on the subject of Indian affairs, before the adoption of the constitution, with the view of ascertaining in what light the Indians have been considered by the first official acts, in relation to them, by the United States. For this object, it might not be improper to notice how they were considered by the European inhabitants, who first formed settlements in this part of the continent of America.

The abstract right of every section of the human race to a reasonable portion of the soil, by which to acquire the means of subsistence, cannot be controverted. And it is equally clear, that the range of nations or tribes, who exist in the hunter state, may be restricted within reasonable limits. They shall not be permitted to roam, in the pursuit of game, over an extensive and rich country, whilst in other parts, human beings are crowded so closely together, as to render the means of subsistence precarious. The law of nature, which is paramount to all other laws, gives the right to every nation, to the enjoyment of a reasonable extent of country, so as to derive the means of subsistence from the soil.

In this view perhaps, our ancestors, when they first migrated to this country, might have taken possession of a limited extent of the domain, had they been sufficiently powerful, without negotiation or purchase from the native Indians. But this course is believed to have been nowhere taken. A more

conciliatory mode was preferred, and one which was better calculated to impress the Indians, who were then powerful, with a sense of the justice of their white neighbours. The occupancy of their lands was never assumed, except upon the basis of contract, and on the payment of a valuable consideration.

This policy has obtained from the earliest white settlements in this country, down to the present time. Some cessions of territory may have been made by the Indians, in compliance with the terms on which peace was offered by the whites; but the soil, thus taken, was taken by the laws of conquest, and always as an indemnity for the expenses of the war, commenced by the Indians.

At no time has the sovereignty of the country been recognized as existing in the Indians, but they have been always admitted to possess many of the attributes of sovereignty. All the rights which belong to self government have been recognized as vested in them. Their right of occupancy has never been questioned, but the fee in the soil has been considered in the government. This may be called the right to the ultimate domain, but the Indians have a present right of possession.

In some of the old states, Massachusetts, Connecticut, Rhode Island and others, where small remnants of tribes remain, surrounded by white population, and who, by their reduced numbers, had lost the power of self government, the laws of the state have been extended over them, for the protection of their persons and property.

Before the adoption of the constitution, the mode of treating with the Indians was various. After the formation of the confederacy, this subject was placed under the special superintendence of the United Colonies; though, subsequent to that time, treaties may have been occasionally entered into between a state and the Indians in its neighbourhood. It is not considered to be at all important to go into a minute inquiry on this subject.

By the constitution, the regulation of commerce among the Indian tribes is given to congress. This power must be considered as exclusively vested in congress, as the power to regulate commerce with foreign nations, to coin money, to

[*Worcester v. The State of Georgia.*]

establish post offices, and to declare war.    It is enumerated in the same section, and belongs to the same class of powers.

This investiture of power has been exercised in the regulation of commerce with the Indians, sometimes by treaty, and, at other times, by enactments of congress.    In this respect they have been placed by the federal authority, with but few exceptions, on the same footing as foreign nations.

It is said that these treaties are nothing more than compacts, which cannot be considered as obligatory on the United States, from a want of power in the Indians to enter into them.

What is a treaty?    The answer is, it is a compact formed between two nations or communities, having the right of self government.

Is it essential that each party shall possess the same attributes of sovereignty, to give force to the treaty?    This will not be pretended: for, on this ground, very few valid treaties could be formed.    The only requisite is, that each of the contracting parties shall possess the right of self government, and the power to perform the stipulations of the treaty.

Under the constitution, no state can enter into any treaty; and it is believed that, since its adoption, no state, under its own authority, has held a treaty with the Indians.

It must be admitted, that the Indians sustain a peculiar relation to the United States.    They do not constitute, as was decided at the last term, a foreign state, so as to claim the right to sue in the supreme court of the United States: and yet, having the right of self government, they, in some sense, form a state.    In the management of their internal concerns, they are dependent on no power.    They punish offences under their own laws, and, in doing so, they are responsible to no earthly tribunal.    They make war, and form treaties of peace.    The exercise of these and other powers, gives to them a distinct character as a people, and constitutes them, in some respects, a state, although they may not be admitted to possess the right of soil.

By various treaties, the Cherokees have placed themselves under the protection of the United States: they have agreed to trade with no other people, nor to invoke the protection of any other sovereignty.    But such engagements do not divest

them of the right of self government, nor destroy their capacity to enter into treaties or compacts.

Every state is more or less dependent on those which surround it; but, unless this dependence shall extend so far as to merge the political existence of the protected people into that of their protectors, they may still constitute a state. They may exercise the powers not relinquished, and bind themselves as a distinct and separate community.

The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense. To contend that the word "allotted," in reference to the land guarantied to the Indians in certain treaties, indicates a favour conferred, rather than a right acknowledged, would, it would seem to me, do injustice to the understanding of the parties. How the words of the treaty were understood by this unlettered people, rather than their critical meaning, should form the rule of construction.

The question may be asked, is no distinction to be made between a civilized and savage people? Are our Indians to be placed upon a footing with the nations of Europe, with whom we have made treaties?

The inquiry is not, what station shall now be given to the Indian tribes in our country? but, what relation have they sustained to us, since the commencement of our government?

We have made treaties with them; and are those treaties to be disregarded on our part, because they were entered into with an uncivilized people? Does this lessen the obligation of such treaties? By entering into them, have we not admitted the power of this people to bind themselves, and to impose obligations on us?

The president and senate, except under the treaty-making power, cannot enter into compacts with the Indians, or with foreign nations. This power has been uniformly exercised in forming treaties with the Indians.

Nations differ from each other in condition, and that of the same nation may change by the revolutions of time, but the

[Worcester v. The State of Georgia.]

principles of justice are the same. They rest upon a base which will remain beyond the endurance of time.

After a lapse of more than forty years since treaties with the Indians have been solemnly ratified by the general government, it is too late to deny their binding force. Have the numerous treaties which have been formed with them, and the ratifications by the president and senate, been nothing more than an idle pageantry?

By numerous treaties with the Indian tribes, we have acquired accessions of territory, of incalculable value to the union. Except by compact, we have not even claimed a right of way through the Indian lands. We have recognised in them the right to make war. No one has ever supposed that the Indians could commit treason against the United States. We have punished them for their violation of treaties; but we have inflicted the punishment on them as a nation, and not on individual offenders among them as traitors.

In the executive, legislative, and judicial branches of our government, we have admitted, by the most solemn sanctions, the existence of the Indians as a separate and distinct people, and as being vested with rights which constitute them a state, or separate community—not a foreign, but a domestic community—not as belonging to the confederacy, but as existing within it, and, of necessity, bearing to it a peculiar relation.

But, can the treaties which have been referred to, and the law of 1802, be considered in force within the limits of the state of Georgia?

In the act of cession, made by Georgia, to the United States, in 1802, of all lands claimed by her west of the line designated, one of the conditions was, " that the United States should, at their own expense, extinguish, for the use of Georgia, as early as the same can be peaceably obtained, on reasonable terms, the Indian title to lands within the state of Georgia."

One of the counsel, in the argument, endeavoured to show, that no part of the country now inhabited by the Cherokee Indians, is within what is called the chartered limits of Georgia.

It appears that the charter of Georgia was surrendered

by the trustees, and that, like the state of South Carolina, she became a regal colony. The effect of this change was, to authorise the crown to alter the boundaries, in the exercise of its discretion. Certain alterations, it seems, were subsequently made: but I do not conceive it can be of any importance to enter into a minute consideration of them. Under its charter, it may be observed, that Georgia derived a right to the soil, subject to the Indian title, by occupancy. By the act of cession, Georgia designated a certain line as the limit of that cession, and this line, unless subsequently altered, with the assent of the parties interested, must be considered as the boundary of the state of Georgia. This line having been thus recognized, cannot be contested on any question which may incidentally arise for judicial decision.

It is important, on this part of the case, to ascertain in what light Georgia has considered the Indian title to lands, generally, and particularly, within her own boundaries; and also, as to the right of the Indians to self-government.

In the first place, she was a party to all the treaties entered into between the United States and the Indians, since the adoption of the constitution. And prior to that period, she was represented in making them, and was bound by their provisions, although it is alleged that she remonstrated against the treaty of Hopewell. In the passage of the intercourse law of 1802, as one of the constituent parts of the union, she was also a party.

The stipulation made in her act of cession, that the United States should extinguish the Indian title to lands within the state, was a distinct recognition of the right in the federal government, to make the extinguishment; and also, that, until it should be made, the right of occupancy would remain in the Indians.

In a law of the state of Georgia, "for opening the land office and for other purposes," passed in 1783, it is declared that surveys made on Indian lands were null and void; a fine was inflicted on the person making the survey, which, if not paid by the offender, he was punished by imprisonment. By a subsequent act, a line was fixed for the Indians, which was a boundary between them and the whites. A similar provision is found in other laws of Georgia, passed before the adoption

of the constitution.   By an act of 1787, severe corporeal punishment was inflicted on those who made or attempted to make surveys, "beyond the temporary line designating the Indian hunting ground."

On the 19th of November 1814, the following resolutions were adopted by the Georgia legislature.

" Whereas, many of the citizens of this state, without regard to existing treaties between the friendly Indians and the United States, and contrary to the interest and good policy of this state, have gone, and are frequently going over, and settling and cultivating the lands allotted to the friendly Indians for their hunting ground, by which means the state is not only deprived of their services in the army, but considerable feuds are engendered between us and our friendly neighbouring Indians:

" Resolved, therefore, by the senate and house of representatives of the state of Georgia in general assembly met, that his excellency, the governor, be, and is hereby requested to take the necessary means to have all intruders removed off the Indian lands, and that proper steps be taken to prevent future aggressions."

In 1817, the legislature refused to take any steps to dispose of lands acquired by treaty with the Indians, until the treaty had been ratified by the senate; and, by a resolution, the governor was directed to have the line run between the state of Georgia and the Indians, according to the late treaty.   The same thing was again done in the year 1819, under a recent treaty.

In a memorial to the president of the United States, by the legislature of Georgia, in 1819, they say, " it has long been the desire of Georgia, that her settlements should be extended to her ultimate limits."   "That the soil within her boundaries should be subjected to her control; and, that her police organization and government should be fixed and permanent."
" That the state of Georgia claims a right to the jurisdiction and soil of the territory within her limits."   " She admits, however, that the right is inchoate—remaining to be perfected by the United States, in the extinction of the Indian title; the United States *pro hac vice* as their agents."

The Indian title was also distinctly acknowledged by the act

of 1796, repealing the Yazoo act. It is there declared, in reference to certain lands, that " they are the sole property of the state, subject only to the right of the treaty of the United States, to enable the state to purchase, under its pre-emption right, the Indian title to the same;" and also, that the land is vested in the " state, to whom the right of pre-emption to the same belongs, subject only *to the controlling power of the United State* , to authorise any treaties for, and to superintend the same." This language, it will be observed, was used long before the act of cession.

On the 25th of March 1825, the governor of Georgia issued the following proclamation:

" Whereas it is provided in said treaty, that the United States shall protect the Indians against the incroachments, hostilities, and impositions of the whites, so that they suffer no imposition, molestation, or injury in their persons, goods, effects, their dwellings, or the lands they occupy, until their removal shall have been acomplished, according to the terms of the treaty," which had been recently made with the Indians.

" I have therefore thought proper to issue this my proclamation, warning all persons, citizens of Georgia or others, against trespassing or intruding upon lands occupied by the Indians, within the limits of Georgia, either for the purpose of settlement or otherwise, as every such act will be in direct violation of the provisions of the treaty aforesaid, and will expose the aggressors to the most certain and summary punishment, by the authorities of the state, and the United States." " All good citizens, therefore, pursuing the dictates of good faith, will unite in enforcing the obligations of the treaty, *as the supreme law*," &c.

Many other references might be made to the public acts of the state of Georgia, to show that she admitted the obligation of Indian treaties, but the above are believed to be sufficient. These acts do honour to the character of that highly respectable state.

Under the act of cession, the United States were bound, in good faith, to extinguish the Indian title to lands within the limits of Georgia, so soon as it could be done peaceably and on reasonable terms.

[Worcester v. The State of Georgia.]

The state of Georgia has repeatedly remonstrated to the president on this subject, and called upon the government to take the necessary steps to fulfil its engagement. She complained that, whilst the Indian title to immense tracts of country had been extinguished elsewhere, within the limits of Georgia but little progress had been made; and this was attributed, either to a want of effort on the part of the federal government, or to the effect of its policy towards the Indians. In one or more of the treaties, titles in fee simple were given to the Indians, to certain reservations of land; and this was complained of, by Georgia, as a direct infraction of the condition of the cession. It has also been asserted, that the policy of the government, in advancing the cause of civilization among the Cherokees, and inducing them to assume the forms of a regular government and of civilized life, was calculated to increase their attachment to the soil they inhabit, and to render the purchase of their title more difficult, if not impracticable.

A full investigation of this subject may not be considered as strictly within the scope of the judicial inquiry which belongs to the present case. But, to some extent, it has a direct bearing on the question before the court; as it tends to show how the rights and powers of Georgia were construed by her public functionaries.

By the first president of the United States, and by every succeeding one, a strong solicitude has been expressed for the civilization of the Indians. Through the agency of the government, they have been partially induced, in some parts of the union, to change the hunter state for that of the agriculturist and herdsman.

In a letter addressed by Mr Jefferson to the Cherokees, dated the 9th of January 1809, he recommends them to adopt a regular government, that crimes might be punished and property protected. He points out the mode by which a council should be chosen, who should have power to enact laws; and he also recommended the appointment of judicial and executive agents, through whom the law might be enforced. The agent of the government, who resided among them, was recommended to be associated with their council, that he might give the necessary advice on all subjects relating to their government.

In the treaty of 1817, the Cherokees are encouraged to adopt a regular form of government.

Since that time, a law has been passed making an annual appropriation of the sum of ten thousand dollars, as a school fund, for the education of Indian youths, which has been distributed among the different tribes where schools had been established. Missionary labours among the Indians have also been sanctioned by the government, by granting permits, to those who were disposed to engage in such a work, to reside in the Indian country.

That the means adopted by the general government to reclaim the savage from his erratic life, and induce him to assume the forms of civilization, have had a tendency to increase the attachment of the Cherokees to the country they now inhabit, is extremely probable; and that it increased the difficulty of purchasing their lands, as by act of cession the general government agreed to do, is equally probable.

Neither Georgia, nor the United States, when the cession was made, contemplated that force should be used in the extinguishment of the Indian title; nor that it should be procured on terms that are not reasonable. But, may it not be said, with equal truth, that it was not contemplated by either party that any obstructions to the fulfilment of the compact should be allowed, much less sanctioned, by the United States?

The humane policy of the government towards these children of the wilderness must afford pleasure to every benevolent feeling; and if the efforts made have not proved as successful as was anticipated, still much has been done. Whether the advantages of this policy should not have been held out by the government to the Cherokees within the limits of Georgia, as an inducement for them to change their residence and fix it elsewhere, rather than by such means to increase their attachment to their present home, as has been insisted on, is a question which may be considered by another branch of the government. Such a course might, perhaps, have secured to the Cherokee Indians all the advantages they have realized from the paternal superintendence of the government; and have enabled it, on peaceable and reasonable terms, to comply with the act of cession

Does the intercourse law of 1802 apply to the Indians who

live within the limits of Georgia ?   The nineteenth section of that act provides, "that it shall not be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the individual states ?   This provision, it has been supposed, excepts from the operation of the law the Indian lands which lie within any state.   A moment's reflection will show that this construction is most clearly erroneous.

To constitute an exception to the provisions of this act, the Indian settlement, at the time of its passage, must have been surrounded by settlements of the citizens of the United States, and within the ordinary jurisdiction of a state; not only within the limits of a state, but within the common exercise of its jurisdiction.

No one will pretend that this was the situation of the Cherokees who lived within the state of Georgia in 1802; or, indeed, that such is their present situation.   If, then, they are not embraced by the exception, all the provisions of the act of 1802 apply to them.

In the very section which contains the exception, it is provided, that the use of the road from Washington district to Mero district should be enjoyed, and that the citizens of Tennessee, under the orders of the governor, might keep the road in repair.   And in the same section, the navigation of the Tennessee river is reserved, and a right to travel from Knoxville to Price's settlement; provided the Indians should not object.

Now, all these provisions relate to the Cherokee country; and can it be supposed, by any one, that such provisions would have been made in the act, if congress had not considered it as applying to the Cherokee country, whether in the state of Georgia, or in the state of Tennessee ?

The exception applied, exclusively, to those fragments of tribes which are found in several of the states, and which came literally within the description used.

Much has been said against the existence of an independent power within a sovereign state; and the conclusion has been drawn, that the Indians, as a matter of right, cannot enforce their own laws within the territorial limits of a state.   The refutation of this argument is found in our past history.

That fragments of tribes, having lost the power of self-government, and who lived within the ordinary jurisdiction of a state, have been taken under the protection of the laws, has already been admitted. But there has been no instance, where the state laws have been generally extended over a numerous tribe of Indians, living within the state; and exercising the right of self-government, until recently.

Has Georgia ever, before her late laws, attempted to regulate the Indian communities within her limits? It is true, New York extended her criminal laws over the remains of the tribes within that state, more for their protection than for any other purpose. These tribes were few in number, and were surrounded by a white population. But, even the state of New York has never asserted the power, it is believed, to regulate their concerns beyond the suppression of crime.

Might not the same objection to this interior independent power, by Georgia, have been urged, with as much force as at present, ever since the adoption of the constitution? Her chartered limits, to the extent claimed, embraced a great number of different nations of Indians, all of whom were governed by their own laws, and were amenable only to them. Has not this been the condition of the Indians within Tennessee, Ohio, and other states?

The exercise of this independent power surely does not become more objectionable, as it assumes the basis of justice and the forms of civilization. Would it not be a singular argument to admit, that, so long as the Indians govern by the rifle and the tomahawk, their government may be tolerated; but, that it must be suppressed, so soon as it shall be administered upon the enlightened principles of reason and justice?

Are not those nations of Indians who have made some advances in civilization, better neighbours than those who are still in a savage state? And is not the principle, as to their self government, within the jurisdiction of a state, the same?

When Georgia sanctioned the constitution, and conferred on the national legislature the exclusive right to regulate commerce or intercourse with the Indians, did she reserve the right to regulate intercourse with the Indians within her limits? This will not be pretended. If such had been the construction of her own powers, would they not have been exercised?

Did her senators object to the numerous treaties which have been formed with the different tribes, who lived within her acknowledged boundaries? Why did she apply to the executive of the union, repeatedly, to have the Indian title extinguished; to establish a line between the Indians and the state, and to procure a right of way through the Indian lands?

The residence of Indians, governed by their own laws, within the limits of a state, has never been deemed incompatible with state sovereignty, until recently. And yet, this has been the condition of many distinct tribes of Indians, since the foundation of the federal government..

How is the question varied by the residence of the Indians in a territory of the United States? Are not the United States sovereign within their territories? And has it ever been conceived, by any one, that the Indian governments, which exist in the territories, are incompatible with the sovereignty of the union?

A state claims the right of sovereignty, commensurate with her territory; as the United States claim it, in their proper sphere, to the extent of the federal limits. This right or power, in some cases, may be exercised, but not in others. Should a hostile force invade the country, at its most remote boundary, it would become the duty of the general government to expel the invaders. But it would violate the solemn compacts with the Indians, without cause, to dispossess them of rights which they possess by nature, and have been uniformly acknowledged by the federal government.

Is it incompatible with state sovereignty to grant exclusive jurisdiction to the federal government over a number of acres of land, for military purposes ? Our forts and arsenals, though situated in the different states, are not within their jurisdiction.

Does not the constitution give to the United States as exclusive jurisdiction in regulating intercourse with the Indians, as has been given to them over any other subjects ? Is there any doubt as to this investiture of power ? Has it not been exercised by the federal government, ever since its formation, not only without objection, but under the express sanction of all the states ?

The power to dispose of the public domain is an attribute

of sovereignty. Can the new states dispose of the lands within their limits, which are owned by the federal government? The power to tax is also an attribute of sovereignty; but, can the new states tax the lands of the United States? Have they not bound themselves, by compact, not to tax the public lands, nor until five years after they shall have been sold? May they violate this compact, at discretion?

Why may not these powers be exercised by the respective states? The answer is, because they have parted with them, expressly for the general good. Why may not a state coin money, issue bills of credit, enter into a treaty of alliance or confederation, or regulate commerce with foreign nations? Because these powers have been expressly and exclusively given to the federal government.

Has not the power been as expressly conferred on the federal government, to regulate intercourse with the Indians; and is it not as exclusively given, as any of the powers above enumerated? There being no exception to the exercise of this power, it must operate on all communities of Indians, exercising the right of self-government; and consequently, include those who reside within the limits of a state, as well as others. Such has been the uniform construction of this power by the federal government, and of every state government, until the question was raised by the state of Georgia.

Under this clause of the constitution, no political jurisdiction over the Indians, has been claimed or exercised. The restrictions imposed by the law of 1802, come strictly within the power to regulate trade; not as an incident, but as a part of the principal power. It is the same power, and is conferred in the same words, that has often been exercised in regulating trade with foreign countries. Embargoes have been imposed, laws of non-intercourse have been passed, and numerous acts, restrictive of trade, under the power to regulate commerce with foreign nations.

In the regulation of commerce with the Indians, congress have exercised a more limited power than has been exercised in reference to foreign countries. The law acts upon our own citizens, and not upon the Indians, the same as the laws referred to act upon our own citizens in their foreign commercial intercourse.

[Worcester v. The State of Georgia.]

It will scarcely be doubted by any one, that, so far as the Indians, as distinct communities, have formed a connexion with the federal government, by treaties; that such connexion is political, and is equally binding on both parties.   This cannot be questioned, except upon the ground, that in making these treaties, the federal government has transcended the treaty-making power.   Such an objection, it is true, has been stated, but it is one of modern invention, which arises out of local circumstances; and is not only opposed to the uniform practice of the government, but also to the letter and spirit of the constitution.

But the inquiry may be made, is there no end to the exercise of this power over Indians within the limits of a state, by the general government?   The answer is, that, in its nature, it must be limited by circumstances.

If a tribe of Indians shall become so degraded or reduced in numbers, as to lose the power of self-government, the protection of the local law, of necessity, must be extended over them. The point at which this exercise of power by a state would be proper, need not now be considered: if indeed it be a judicial question.   Such a question does not seem to arise in this case. So long as treaties and laws remain in full force, and apply to Indian nations, exercising the right of self-government, within the limits of a state, the judicial power can exercise no discretion in refusing to give effect to those laws, when questions arise under them, unless they shall be deemed unconstitutional.

The exercise of the power of self-government by the Indians, within a state, is undoubtedly contemplated to be temporary.   This is shown by the settled policy of the government, in the extinguishment of their title, and especially by the compact with the state of Georgia.   It is a question, not of abstract right, but of public policy.   I do not mean to say, that the same moral rule which should regulate the affairs of private life, should not be regarded by communities or nations. But, a sound national policy does require that the Indian tribes within our states should exchange their territories, upon equitable principles, or, eventually, consent to become amalgamated in our political communities.

At best they can enjoy a very limited independence within

the boundaries of a state, and such a residence must always subject them to encroachments from the settlements around them; and their existence within a state, as a separate and independent community, may seriously embarrass or obstruct the operation of the state laws. If, therefore, it would be inconsistent with the political welfare of the states, and the social advance of their citizens, that an independent and permanent power should exist within their limits, this power must give way to the greater power which surrounds it, or seek its exercise beyond the sphere of state authority.

This state of things can only be produced by a co-operation of the state and federal governments. The latter has the exclusive regulation of intercourse with the Indians; and, so long as this power shall be exercised, it cannot be obstructed by the state. It is a power given by the constitution, and sanctioned by the most solemn acts of both the federal and state governments: consequently, it cannot be abrogated at the will of a state. It is one of the powers parted with by the states, and vested in the federal government. But, if a contingency shall occur, which shall render the Indians who reside in a state, incapable of self-government, either by moral degradation or a reduction of their numbers, it would undoubtedly be in the power of a state government to extend to them the ægis of its laws. Under such circumstances, the agency of the general government, of necessity, must cease.

But, if it shall be the policy of the government to withdraw its protection from the Indians who reside within the limits of the respective states, and who not only claim the right of self government, but have uniformly exercised it; the laws and treaties which impose duties and obligations on the general government should be abrogated by the powers competent to do so. So long as those laws and treaties exist, having been formed within the sphere of the federal powers, they must be respected and enforced by the appropriate organs of the federal government.

The plaintiff who prosecutes this writ of error, entered the Cherokee country, as it appears, with the express permission of the president, and under the protection of the treaties of the United States, and the law of 1802. He entered, not to corrupt the morals of this people, nor to profit by their substance; but to

teach them, by precept and example, the Christian religion. If he be unworthy of this sacred office; if he had any other object than the one professed; if he sought, by his influence, to counteract the humane policy of the federal government towards the Indians, and to embarrass its efforts to comply with its solemn engagement with Georgia; though his sufferings be illegal, he is not a proper object of public sympathy.

It has been shown, that the treaties and laws referred to come within the due exercise of the constitutional powers of the federal government; that they remain in full force, and consequently must be considered as the supreme laws of the land. These laws throw a shield over the Cherokee Indians. They guarantied to them their rights of occupancy, of self-government, and the full enjoyment of those blessings which might be attained in their humble condition. But, by the enactments of the state of Georgia, this shield is broken in pieces—the infant institutions of the Cherokees are abolished, and their laws annulled. Infamous punishment is denounced against them, for the exercise of those rights which have been most solemnly guarantied to them by the national faith.

Of these enactments, however, the plaintiff in error has no right to complain, nor can he question their validity, except in so far as they affect his interests. In this view and in this view only, has it become necessary, in the present case, to consider the repugnancy of the laws of Georgia to those of the union.

Of the justice or policy of these laws, it is not my province to speak: such considerations belonging to the legislature by whom they were passed. They have, no doubt, been enacted under a conviction of right, by a sovereign and independent state, and their policy may have been recommended, by a sense of wrong under the compact. Thirty years have elapsed since the federal government engaged to extinguish the Indian title, within the limits of Georgia. That she has strong ground of complaint arising from this delay, must be admitted; but such considerations are not involved in the present case; they belong to another branch of the government. We can look only to the law, which defines our power, and marks out the path of our duty.

Under the administration of the laws of Georgia, a citizen of

the United States has been deprived of his liberty; and, claiming protection under the treaties and laws of the United States, he makes the question, as he has a right to make it, whether the laws of Georgia, under which he is now suffering an ignominious punishment, are not repugnant to the constitution of the United States, and the treaties and laws made under it. This repugnancy has been shown; and it remains only to say, what has before been often said by this tribunal of the local laws of many of the states in this union, that, being repugnant to the constitution of the United States, and to the laws made under it, they can have no force to divest the plaintiff in error of his property or liberty.

Mr Justice BALDWIN dissented: stating that in his opinion, the record was not properly returned upon the writ of error; and ought to have been returned by the state court, and not by the clerk of that court. As to the merits, he said his opinion remained the same as was expressed by him in the case of the Cherokee Nation v. The State of Georgia, at the last term.

The opinion of Mr Justice Baldwin was not delivered to the reporter.

This cause came on to be heard on the transcript of the record from the superior court for the county of Gwinnett, in the state of Georgia, and was argued by counsel; on consideration whereof, it is the opinion of this Court, that the act of the legislature of the state of Georgia, upon which the indictment in this case is founded, is contrary to the constitution, treaties, and laws of the United States; and that the special plea in bar pleaded by the said Samuel A. Worcester, in manner aforesaid, and relying upon the constitution, treaties, and laws of the United States aforesaid, is a good bar and defence to the said indictment, by the said Samuel A. Worcester; and as such ought to have been allowed and admitted by the said superior court for the county of Gwinnett, in the state of Georgia, before which the said indictment was pending and tried; and that there was error in the said superior court of the state of Georgia, in overruling the plea so pleaded as aforesaid. It is therefore ordered and adjudged, that the judgment rendered in

[Worcester v. The State of Georgia.]

the premises, by the said superior court of Georgia, upon the verdict upon the plea of Not guilty afterwards pleaded by the said Samuel A. Worcester, whereby the said Samuel A. Worcester is sentenced to hard labour in the penitentiary of the state of Georgia, ought to be reversed and annulled. And this court proceeding to render such judgment as the said superior Court, of the state of Georgia should have rendered, it is further ordered and adjudged, that the said judgment of the said superior court be, and hereby is reversed and annulled; and that judgment be, and hereby is awarded, that the special plea in bar, so as aforesaid pleaded, is a good and sufficient plea in bar in law to the indictment aforesaid; and that all proceedings on the said indictment do for ever surcease; and that the said Samuel A. Worcester be, and hereby is henceforth dismissed therefrom, and that he go thereof quit without day. And that a special mandate do go from this court, to the said superior court, to carry this judgment into execution.

In the case of Butler, Plaintiff in Error v. The State of Georgia, the same judgment was given by the court, and a special mandate was ordered from the court to the superior court of Gwinnett county, to carry the judgment into execution.